**Eric C. RAJALA, Trustee in Bankruptcy for General Poly Corporation, Plaintiff/Appellee and Cross–Appellant,**

v.

**ALLIED CORPORATION, Defendant/Appellant, and Cross–Appellee.**

Nos. 88–1727, 88–1762.

United States Court of Appeals, Tenth Circuit.

Nov. 2, 1990.

Rehearing Denied in No. 88–1727 Dec. 14, 1990.

---

Brian D. Forrow (Thomas D. Kent, Anthony J. Stewart, Allied–Signal, Inc., Morristown, N.J., Byron J. Beck, W. Dennis

Cross, Morrison, Hecker, Curtis, Kuder & Parrish, and Harry L. Hobson, Elizabeth A. Phelan, Charles M. Johnson, Holland & Hart, Denver, Colo., on the briefs), for defendant/appellant, and cross-appellee.

Charles W. German (Matthew J. Verschelden, Stinson, Mag & Fizzell, Kansas City, Mo., Roger D. Stanton, Stinson, Mag & Fizzell, Overland Park, Kan., and Brent L. Brown, Stinson, Mag & Fizzell, Dallas, Tex., with him on the briefs), for plaintiff/appellee and cross-appellant.

Before HOLLOWAY, SEYMOUR and EBEL, Circuit Judges.

EBEL, Circuit Judge.

## INTRODUCTION

Because of the complex factual history of this action, the evidence relevant to each issue is set forth in the subsection addressing that particular issue. The following is simply a brief summary of the events which preceded this litigation.

Plaintiff-appellee General Poly Corporation ("General Poly") was a manufacturer of plastic films used to manufacture products such as merchandise bags and rubbish can liners. Defendant-appellant Allied Corporation ("Allied") is a chemical company which produces, among other things, the resins used by manufacturers of plastic films such as General Poly.

Prior to the formation of General Poly, representatives of the yet unincorporated company met with Allied executives to discuss the development of certain high molecular weight ("HMW") resin products. HMW resins are desirable because their greater strength allows for production of a thin film comparable in strength to thicker films produced from other resins. At that time, there was no domestic producer of HMW resins.

The two companies entered into several agreements concerning the HMW resin. Allied proceeded with its development efforts, but its resin development did not meet General Poly's expectations. General Poly purchased substandard ("off-grade") HMW resin from Allied in order to fill some of its needs, although the majority of its resin was obtained from other sources.

General Poly ultimately was unable to operate as a profitable company. General Poly filed for protection in bankruptcy and the trustee in bankruptcy brought a variety of tort and contract claims against Allied in this action. The district court dismissed most of the claims by directed verdict and summary judgment. However, General Poly prevailed on its claim for breach of fiduciary duty, obtaining a jury verdict in its favor for just over $70 million dollars in compensatory and punitive damages. Allied appeals that jury verdict and the denial of its motion for j.n.o.v. General Poly cross-appeals the unfavorable directed verdicts on its other claims.

## DISCUSSION

### I. *The Fiduciary Duty Claim*

The only claim brought by General Poly which survived Allied's motions for summary judgment and directed verdict was the claim for breach of fiduciary duty. The jury returned a verdict in favor of General Poly, ruling that Allied owed General Poly fiduciary duties and that Allied had breached those duties. Allied moved for judgment notwithstanding the verdict, arguing that the jury instructions misinterpreted Kansas' law of fiduciary duties and that General Poly had presented insufficient evidence to demonstrate either that Allied owed General Poly fiduciary duties or that Allied breached any such duties.

On appeal, Allied challenges the district court's denial of its motion for judgment notwithstanding the verdict on each of the grounds asserted below. In subpart one of this section, we set forth our understanding of the law of fiduciary relationships in Kansas. In subpart two, we review the evidence presented below and hold that Allied's motion for judgment notwithstanding the verdict was improperly denied because there was insufficient evidence of a fiduciary relationship.

### A. Fiduciary Duty Law in Kansas

In *Denison State Bank v. Madeira*, 230 Kan. 684, 691, 640 P.2d 1235, 1241 (1982),

the Supreme Court of Kansas summarized the law of fiduciary relationships as follows:

It may be said that generally there are two types of fiduciary relationships: (1) those specifically created by contract such as principal and agent, attorney and client, and trustee cestui que trust, for example, and those created by formal legal proceedings such as guardian and/or conservator and ward, and executor and administrator of an estate, among others, and (2) those implied in law due to the factual situation surrounding the involved transactions and the relationship of the parties to each other and to the questioned transactions.

Here, as in *Denison,* it is the second type of fiduciary relationship with which we are concerned.

■■■ Determination of whether this second type of fiduciary relationship " 'exists depends on the facts and circumstances of each individual case. [The Supreme Court of Kansas] has refused, for that reason, to give an exact definition to fiduciary relations.' " *Id.* (quoting *Curtis v. Freden,* 224 Kan. 646, 651, 585 P.2d 993, 998 (1978)). Although such fiduciary relationships cannot be defined with precision, the Supreme Court of Kansas has prescribed "certain broad principles which should be considered in making the determination of whether a fiduciary relationship exists in any particular factual situation:

A fiduciary relationship imparts a position of *peculiar confidence placed by one individual in another.* A fiduciary is a person with a duty to *act primarily for the benefit of another.* A fiduciary is in a position to have and exercise, and does *have and exercise influence over another.* A fiduciary relationship implies a condition of *superiority of one of the parties over the other.* Generally, in a fiduciary relationship, the property, interest or authority of the other is *placed in the charge of the fiduciary.*

*Id.* (emphasis in original).

■■■ The court in *Denison* made clear that each of the general considerations listed above need not be present in every case in which a fiduciary relationship is alleged. However, the court emphasized that an overriding consideration in the law of fiduciary relationships was that "one may not abandon all caution and responsibility for his own protection and *unilaterally impose a fiduciary relationship on another without a conscious assumption of such duties by the one sought to be held liable as a fiduciary.*" *Denison,* 230 Kan. at 696, 640 P.2d at 1243–44 (emphasis added). The court went on to state that "[t]his is particularly true when one ... is fully competent and able to protect his own interests." *Id.*

■■■ A fiduciary relationship whereby both parties assume fiduciary obligations to each other or to a common entity similarly requires a conscious assumption of fiduciary obligations by the parties. For example, in *Paul v. North,* 191 Kan. 163, 380 P.2d 421 (1963), the Supreme Court of Kansas stated that fiduciary relationships

"may arise out of conduct of the parties evidencing an agreement to engage in a joint enterprise for the mutual benefit of the parties.... But they necessarily spring from an attitude of trust and confidence and *are based upon some form of agreement, either expressed or implied, from which it can be said that the minds have met in a manner to create mutual obligations.*"

*Id.* 191 Kan. at 170, 380 P.2d at 426 (citations omitted) (emphasis added). Although a fiduciary relationship may arise out of an agreement to act together for the mutual benefit of the parties, such a relationship cannot be established by accident or inadvertence.

"Mere concert of action without more, does not establish a fiduciary relationship.... Undoubtedly, parties may deal at arm's length for their mutual profit. It is only when, by their concerted action, they *willingly and knowingly act for one another in a manner to impose mutual trust and confidence that a fiduciary relationship arises.*"

*Wolf v. Brungardt,* 215 Kan. 272, 285, 524 P.2d 726, 736 (1974) (emphasis added).

This court has also recognized that conscious assumption of the alleged fiduciary duty is a mandatory element under Kansas law. *See Hotmar v. Lowell H. Listrom & Co., Inc.,* 808 F.2d 1384, 1387 n. 3 (10th Cir.1987); *cf.* 36A C.J.S. *Fiduciary,* 385 (1955) ("As a general rule, a fiduciary relationship is established only when it is shown that the confidence reposed by one person was actually accepted by the other, and merely reposing confidence in another may not, of itself, create the relationship") (footnotes omitted).

■ Although the courts of Kansas have suggested that a somewhat more protective approach may be used when one party is under a disability or disadvantage, *Cornett v. Roth,* 233 Kan. 936, 941, 666 P.2d 1182, 1186 (1983), *Wedman v. Home Nat. Bank of Arkansas City,* No. 88–1439–K (D.Kan., Jan. 25, 1990) (WESTLAW, 1990 WL 7501), this more protective approach will ordinarily not be utilized as between two or more business people or business entities who each possess the capacity to protect themselves. *See Ritchie Enterprises v. Honeywell Bull, Inc.,* 730 F.Supp. 1041, 1054 (D.Kan.1990) (holding that a seller's superior knowledge of a product does not justify imposition of a fiduciary relationship in the absence of a conscious assumption of fiduciary duties). The Supreme Court of Kansas has cautioned against an approach which would unfairly "convert ordinary day-to-day business transactions into fiduciary relationships where none were intended or anticipated." *Denison,* 230 Kan. at 696, 640 P.2d at 1243.

### B. Sufficiency of the Evidence Showing a Fiduciary Duty

Allied made a motion for directed verdict at the end of plaintiff's case and again following presentation of its own evidence, both of which were denied as to the fiduciary duty claim. Following the trial, Allied moved for judgment notwithstanding the verdict, arguing that General Poly had presented insufficient evidence to establish the existence of a fiduciary duty. *See* R. Vol. 2, Doc. 729 at 22. The district court denied the motion, *see id.* at 27, and Allied appeals that ruling.

### 1. Standard of Review & Burden of Proof

■ We review *de novo* the denial of a motion for judgment notwithstanding the verdict applying the same standard of review as that used by the district court. *See Guilfoyle v. Missouri, Kansas & Texas R. Co.,* 812 F.2d 1290, 1292 (10th Cir.1987). "Although we have often used different phraseology to express this standard," the inquiry is best summarized as "whether there is evidence upon which the jury could properly find a verdict for the party [against whom the motion is directed]." *Hurd v. American Hoist & Derrick Co.,* 734 F.2d 495, 498–99 (10th Cir.1984) (footnote omitted) (quoting 9 C. Wright & A. Miller, *Federal Practice and Procedure,* § 2524 at 543 (1971)). In making that determination, we are obligated to view "evidence and inferences most favorably to the nonmoving party." *Zimmerman v. First Fed. Sav. & Loan Ass'n,* 848 F.2d 1047, 1051 (10th Cir.1988).

■ Because the directed verdict/judgment notwithstanding the verdict inquiry asks whether there was evidence such that the jury could have *properly* found for the party against whom the motion is made, we must necessarily frame our analysis in terms of the underlying burden of proof. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986) ("we are convinced that the inquiry involved in a ruling on a motion for ... directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits"). Under Kansas law a party seeking to establish the existence of a fiduciary relationship must prove it by clear and convincing evidence. "For the plainest of reasons, agreements establishing fiduciary relationships, if not in writing, must be clear and convincing.... A confidential relationship is never presumed, and the burden of proof is on the party asserting it." *Wolf v. Brungardt,* 215 Kan. 272, 284–85, 524 P.2d 726,

736 (1974) (quoting *Paul v. Smith*, 191 Kan. 163, 170, 380 P.2d 421, 426 (1963)).

## 2. *Evidence of a Fiduciary Relationship Presented At Trial*

General Poly maintains that the alleged fiduciary relationship was formed at the meeting of General Poly and Allied representatives held on January 10, 1979. *See* Appellee's Br. at 10. However, the jury was instructed that: "Plaintiff claims this relationship was formed in *late* January, 1979, when the parties began to pursue their joint development efforts in confidence and secrecy. Plaintiff contends the written contract signed in September of 1979 merely memorialized the parties' agreement to jointly develop resin and maintain secrecy, but that it did not change the nature of the parties' fiduciary relationship." R. Vol. 2, Doc. 660 (emphasis added). Because there is some discrepancy between the jury instruction and General Poly's position on appeal, we will not restrict ourselves to evidence of the January 10, 1979 meeting. What follows is a representative summary of the evidence presented at trial relating to the question of whether Allied consciously agreed to assume fiduciary obligations to General Poly.

### *Events Prior To The January 10, 1979 Meeting*

The earliest contact between Allied and anyone involved in General Poly predates the formation of General Poly. Clayton A. Walker, who would later become chairman of the board and treasurer of General Poly, testified that sometime prior to October 10, 1978, he contacted George Jecha, an Allied resin sales representative. R. Vol. 10 at 601. Walker testified that he asked Jecha "has Allied got anything, are they moving in any direction in high molecular weight high-density polyethylene and.... George told me yes. He said, as a matter of fact, he was aware, he didn't know exactly where they stood, but he knew that they were definitely interested in looking at developing high molecular weight high-density polyethylene product." *Id.* A meeting was scheduled in Houston between Allied representatives and Walker and his associ-

ates, Hans Traver and Edward Podolak. *Id.* at 603.

On or about October 11–12, 1978, a meeting was held at Traver's home in Houston. *Id.* Jecha attended the meeting on behalf of Allied, and Walker, Traver, and Podolak represented the then-unincorporated General Poly company. *Id.* Another Allied representative, technical specialist Pat Snell, was unable to attend the meeting but participated by telephone. *Id.* Walker testified that he and his associates "told George [Jecha] that we had to have a domestic source [of high molecular weight resin] and I further told George without belaboring the issue, that the reason I had called him is that I knew he would, that he would, within the realm of his knowledge, tell me the truth about exactly what Allied was doing." *Id.* at 605. Traver testified that Jecha did not tell him anything about Allied's plans for high molecular weight (HMW) resin but said "that to the best of his knowledge Allied was involved in the Baton Rouge group in developing such a high molecular weight resin; but he did not give me any great details." R. Vol. 24 at 2219. After the meeting, in a letter to Allied's high-density polyethylene (HDPE) national accounts manager, W.D. Singleton, Jecha wrote the following:

> Having known Bud Walker for so many years and now meeting Hans Traver, there's little doubt in my mind that if they put this new company together, our being in on the ground floor will be of great benefit as this first eight million pound requirement will be a drop in the bucket compared to what they will be using in years to come. My only concern at the moment is whether or not we can put together a suitable sample for the Lima, Peru operation to get this thing started.

R. Vol. 9 at 401; Plaintiff's Ex. 99 (First Addendum to Appellant's Br., Doc. 1).

In early November of 1978, Allied's technical specialist, Pat Snell, telephoned Traver to discuss HDPE resins. *See id.* In that conversation, "Traver indicated his

willingness to offer the PeruPlast plant[1] for testing." R. Vol. 20 at 1478. After the phone conversation with Traver, in a hand-written note drafted on Jecha's memo, Snell stated that "[t]his would be a great opportunity to test the B5920F[2] [Solvay resin], test an Allied version of the same, and make an entry into the HDPE film market in the U.S." Plaintiff's Ex. 99 at 2.

In November 1978, Walker, Traver, and Podolak met with Allied's Singleton at a trade meeting in Chicago. R. Vol. 10 at 608. Podolak testified that when Traver mentioned to Singleton that the German Hoescht Company soon planned to open a resin plant to produce HMW HDPE in Texas, Singleton replied "Allied Chemical will have a product ready before the Germans have that plant up and running." R. Vol. 38 at 4190. According to both Podolak and Traver, Singleton further stated that Allied would sell its HMW resin at one or two cents a pound above the price for injection grade resin, an established HDPE resin. *Id.;* R. Vol. 24 at 2221. According to Walker, Singleton agreed to arrange a meeting between the promoters and Allied's "decision makers." R. Vol. 10 at 609.

### The January 10, 1979 Meeting

A meeting took place at Traver's home in Houston on January 10, 1979. R. Vol. 24 at 2227–28. Traver and Walker represented the new venture—General Poly. Jecha, Singleton, and Snell attended on behalf of Allied, as well as Donald J. Bonin, Allied's vice-president and general manager for HDPE products, and Paul Heath, Allied's HDPE marketing director. *Id.* at 2228.

Walker told the Allied representatives of the planned venture and the need for a domestic supply of HMW resin. R. Vol. 11 at 635. Walker testified that he told Bonin that it was necessary "to determine if [Allied] had a high molecular weight high-density poly material that was equal to or better than Hoescht. That was the whole basis of the project." *Id.* at 647. "I told

Mr. Bonin that we had to have a domestic source of raw material and that that was essential to our project, that we couldn't, we could not rely on imported material and that was the only material that was available at that point in time." R. Vol. 37 at 3967. According to Walker, "Pat Snell and Don Bonin both confirmed that they had been working for some time on a high molecular weight high-density product and that the project was in super shape and they were moving right ahead; that they had anticipated that they would be the first in the business in the United States and that they had a time table and that they were moving toward that time table." *Id.* at 633. "Don Bonin told me and Pat Snell sat there and confirmed that all he had to do to develop that material, they had the reactors, they had just put in a new large reactor in Baton Rouge in anticipation of this and all they had to do was fool with the catalyst—'tinker with the catalyst' were the exact words, and they would have a high molecular weight that was equal to the Hoescht material." *Id.* at 634; R. Vol. 37 at 3968.

Traver testified similarly, recalling that in response to inquiries about the status of Allied's HMW development project Bonin had responded "[w]ell we're working on it; we already have a catalyst, now we have to play with that." R. Vol. 24 at 2231. Traver further testified that Bonin said "the way it looks today we can have—we expect to have a resin out by the fourth quarter of the year, towards the end of the year." *Id.* According to Traver, Bonin asked him about General Poly's timetable and he replied "after the money had been raised and I was in a position to issue purchase orders, it would take me six months to get the main pieces of equipment in. So it would take, let's say, three months to get the money together.... I could thereby meet the Allied time schedule." *Id.* at 2231–32.

Walker testified that during the January 10 meeting he told Don Bonin that we

---

1. The PeruPlast plant was an extrusion operation run by Traver in Lima, Peru.

2. The type of resin referred to as B5920F was a European brand of HMW HDPE produced by the Solvay company. The use of B5920F was licensed to Allied.

had to accomplish the hurdle of financing the long-term financing on the equipment and the building and that in order to do that, I had used in the past—had used revenue bond issue as a vehicle to accomplish that financing. And that I anticipated that we would use the same method of financing of the General Poly plant in this case. I asked Don Bonin if Allied would guarantee or preferably buy the bonds on the bond issue as their financial contribution to the joint venture.... Don Bonin's response was that Allied would participate financially in some manner but that ... he would have to visit with his associates ... [and] get back to me as quickly as possible and see what could happen.

R. Vol. 11 at 656; *see also* R. Vol. 8 at 252.

At the same meeting, the two groups discussed plans to conduct a test of resin at Traver's plant in Lima, Peru. Walker testified that:

I can recall that when Hans [Traver] went over the specifications on the equipment that he had in Peru and the type of equipment, it was German equipment, not any of that equipment available in the United States at that time, and Don Bonin was delighted to find out that that equipment was available and he asked Hans if they could utilize that equipment in some manner to further their technology in testing resins in Peru. Because he pointed out that one of the things they had, they had everything in place, they had everything from a manufacturing standpoint but they had no pilot plant or they had no equipment in their laboratory to actually make film. And that was—the proof of the pudding was to make film. So, he was delighted to find out that Hans had that equipment and Hans made it clear that he would make [available] that equipment and that technology, which included not only equipment, it included trained people, trained personnel, experienced force and technology.

R. Vol. 11 at 638. Walker explained that Bonin told Traver that he wanted to use Traver's extrusion technology "to test Allied's resins." R. Vol. 11 at 639. "Mr.

Bonin told me that he wanted to test his material that they had recently run tests and he wanted to test his material to see also if it was equal to the Hoescht material. So that they'd know what they had." R. Vol. 12 at 755. According to Walker, "Bonin, Singleton, all of the people said that they had an experimental high molecular weight high-density poly product and they wanted to test it." *Id.* at 639–40.

Traver testified similarly, indicating that "the question was whether we could send experimental resins for testing to Lima." R. Vol. 24 at 2232. "[Bonin] asked me if he could use our facilities in Lima for that purpose, and I said, 'Well, of course, delighted to, anything to speed the project along'." *Id.* "[H]e wanted to test the Allied resins. He wanted to see how the resins were doing." *Id.*

Other topics of discussion at the January 10 meeting were the quantity of HMW resin which Walker and Traver anticipated General Poly would need from Allied and the price at which Allied would sell HMW resin to General Poly. Traver explained the method by which he calculated General Poly's expected resin needs and said "I put down a capacity figure of six hundred thousand pounds a month." *Id.* at 2234.

And then after we had those figures, well, Paul Heath says, "Well, Hans, how much you gonna buy from us?" And I said "Well, obviously at least fifty percent or we wouldn't be here with that many people, and if you want to, we can go a hundred percent but that's something we need to talk about. Depends on how good you're gonna be to me." ... That's about as far as we went in the meeting.... Of course, it was understood it was going to be high molecular weight high-density polyethylene; but the specific quality of that resin was brought out during the meeting and the specific quality was a resin like the Hoescht 9255 F.

*Id.* at 2235.

Walker testified that the price of the HMW resin to be purchased from Allied was also discussed at the January 10th

meeting. "Don Bonin told me that they had to get a premium price over the injection molding grade resin and that their price would be what Singleton had said, depending on the market conditions, one to no more than two cents a pound over injection molding grade resin." R. Vol. 11 at 637; *id.* at 658. Walker testified that:

> [W]e agreed that we would buy our material—I agreed that we would buy—Hans and I were there. Hans agreed also we would buy our material from Allied, once developing the product, once having a resin and knowing that we had a resin, we would go ahead with the project, we would buy one hundred percent of our requirements from Allied. And we would buy it at a benchmark price of one to two cents a pound over injection molding grade resin; that I told Mr. Bonin that.

*Id.* at 658–59.

### Communications After the January 10, 1979 Meeting

Although General Poly contends that Allied assumed fiduciary obligations at the January 10, 1979 meeting, it also argues that communications with Allied after the meeting further demonstrated the formation of a fiduciary relationship on January 10, 1979.

Walker testified that Bonin called him within a week of the meeting in Houston. R. Vol. 11 at 660. Walker further testified as follows:

> Mr. Bonin told me ... that Allied would not undertake contingent liabilities of a financial nature without approval from the board of directors.... He had a counterproposal as far as financial help from Allied and their financial assistance in the joint venture and that was within the realm of his authority as general manager, he said: We will give you extended trade terms as a portion of our financial contribution.... Mr. Bonin told me when we first started buying the material that we would set it up to start with on ninety day terms and that these terms could be adjusted, depending on how the project progressed.... And

that was agreeable with me because when we did our cash flows and ninety day terms on eight million pounds of product would have been the same thing as giving us an injection of capital or working capital that would have amounted to about 5 hundred thousand dollars.

*Id.* at 660–62. According to Walker, Bonin also said, "I'm going to forward you ... the secrecy agreement that we talked about in our meeting of January the 10th." *Id.* at 664.

As discussed in his phone conversation with Walker, on January 23, 1979, Bonin sent Walker a letter containing the following statements:

> It is our intention, as stated to you in our recent meeting in Houston, to pursue the development of competitive polymers to satisfy [the] market. As you know we already supply some resins for the film market but feel that additional new resins are needed and can be developed to meet specific requirements such as yours.
>
> As discussed at our meeting with you and Mr. Hans Traver, we would like to have you evaluate these new resins as they are developed.
>
> We, therefore, are proposing that we enter into a joint technical development program with your commitment to test new resins at the Peru Plant in Lima, Peru. To this end we will be forwarding under separate cover a secrecy agreement required to insure the confidentiality of our joint effort.

Plaintiff's Ex. 139 (First Addendum to Appellant's Br., Doc. 3); R. Vol. 11 at 665. The next day, in a letter to more senior Allied management, Bonin wrote:

> Attached for your files is a review of all activities concerning General Poly to date. We are pursuing this matter in some detail because of the complexities involved in acquiring technical skills to penetrate the film market. In the absence of the pilot plant equipment for development work, we must develop a plan of "pulling ourselves up by the bootstraps" in this area.

I believe that General Poly Corporation, if formed, offers us an opportunity for ground floor participation in a plant designed specifically for processing high density polyethylene film.

Plaintiff's Ex. 141 (First Addendum to Appellee's Br., Doc. 8).

On February 14, 1979, a draft of the agreement Bonin and Walker had discussed was sent to Walker. After a series of proposed changes and revisions and lengthy delays, a final copy was signed by the authorized representatives of both General Poly and Allied and dated September 21, 1979. That agreement [the "September 1979 Agreement"] provides, in relevant part:

WHEREAS, Allied Chemical is a manufacturer of high density polyethylene resin;

WHEREAS, General Poly desires to manufacture high density polyethylene films for which high density polyethylene resins having special characteristics may be required;

WHEREAS, Allied Chemical and General Poly desire to enter into a period of joint cooperation aimed at developing and evaluating high density polyethylene resins having the characteristics required for the manufacture of such high density polyethylene films;

NOW, THEREFORE, in consideration of the mutual understanding hereinafter set forth, it is agreed as follows:

1. *Joint Cooperation.* Upon execution of this agreement there shall commence a one (1) year period of joint cooperation in the performance of which Allied Chemical and General Poly shall cooperate with each other to develop high density polyethylene resins and films prepared therefrom.

1.1 During this period of joint cooperation, Allied Chemical shall have the royalty-free, exclusive right and license to use extrusion technology developed by General Poly. After this period of joint cooperation or extended period as provided for in Section 4.2 herein, Allied Chemical shall have a perpetual, royalty free,

non-exclusive right and license to use such extrusion technology.

1.2 For a period commencing with the production by Allied Chemical of a semi-commercial or commercial scale of any new high density polyethylene film grade resin developed and terminating three (3) years thereafter, it is agreed that General Poly shall have the first right to purchase such high density polyethylene film grade resin from Allied Chemical up to a maximum of 500,000 pounds per month. General Poly's first right to purchase film grade pursuant to this Section 1.2, however, shall be contingent upon General Poly giving Allied Chemical at least thirty (30) days' prior written notice of its requirements for each calendar month in which General Poly chooses to exercise its first right to purchase. With respect to each calendar month for which Allied Chemical receives no written timely notice, as provided for herein, Allied Chemical shall be relieved of any obligation to General Poly.

2. *Secrecy.* For a period of five (5) years from the date hereof, General Poly shall maintain in confidence all information disclosed to it in writing hereunder by Allied Chemical and Allied Chemical shall maintain in confidence all information disclosed to it in writing by General Poly relating to extrusion of high density polyethylene film. Each party shall take all reasonable steps and measures necessary to prevent disclosure of such information to third parties; provided, however, that the foregoing obligations shall not apply to any such information if and to the extent that:

(a) at the time of disclosure or subsequent thereto, through no fault of the receiving party, it was or it becomes known to the general public; or

(b) it had been independently perfected by the receiving party or was otherwise in the receiving party's lawful possession prior to disclosure, as shown by written records; or

(c) after such disclosure it is acquired from a third party which did not acquire the information under an obli-

gation of confidentiality from or through the disclosing party.

Nothing herein shall prevent the use of such information in conjunction with the prosecution of patent applications, or as deemed necessary in conjunction with the sale of resin or film products.

3. *Patentable Inventions.*

3.1 Patentable inventions conceived or reduced to practice during and as a result of the joint cooperation provided in Section 1 hereof shall be treated as follows:

3.11 Such inventions shall be owned by Allied Chemical when the invention is directed to high density polyethylene resins, or processes for manufacturing the same;

3.12 Such inventions shall be owned by General Poly where the invention is directed to high density polyethylene film or processes for manufacturing the same;

3.13 The party owning any such invention may elect, at its own option and expense, to apply for patent coverage thereon;

3.14 No rights are hereby granted with respect to any inventions, patent applications or patents owned by either party other that those specifically provided for in this Section 3.

4. *Term and Termination.*

4.1 The period of joint cooperation hereunder shall be one (1) year from the date of execution of this agreement unless sooner terminated by either party by giving thirty (30) days' written notice to the other party. Termination of the period of joint cooperation shall not relieve the parties of their obligations under Sections 1, 2 and 3 hereof.

4.2 The period of joint cooperation hereunder may be extended by mutual agreement of both parties for such period or periods as the parties desire.

5. *Assignment.* This agreement shall be binding upon and inure to the benefit of the parties hereto and the respective successors and assigns of the entire business relating to the subject matter hereof but shall not otherwise be assigned by either party without the written consent of the other, and except as so provided, any purported assignment shall be void.

6. *Law Governing.* This agreement shall be governed by and construed in accordance with the internal laws of the State of New York without regard to conflict of laws.

Plaintiff's Ex. 420 (First Addendum to Appellant's Br., Doc. 8). General Poly maintains that the above written agreement served to memorialize certain aspects of the January 10, 1979 meeting in which Allied assumed fiduciary obligations.

3. *The Basis of the District Court's Denial of Allied's Motion For Judgment Notwithstanding the Verdict*

The district court denied Allied's motion for judgment notwithstanding the verdict, holding that "[t]he evidence presented at trial clearly supports the jury's verdict that a fiduciary relationship existed between the parties and that the fiduciary duties were breached by Allied." R. Vol. 2, Doc. 729 (Dist. Ct. Memorandum and Order, February 26, 1988, at 22). The court explained that "the evidence clearly shows, and the jury found, that a fiduciary relationship existed between these two parties from the beginning of their negotiations." *Id.* Although the district court concluded that the relationship was not a joint venture, the court nonetheless relied on joint venture principles for its conclusion. The district court explained its reliance upon joint venture principles as follows:

> Although I concluded at [the] summary judgment stage that a technical joint venture did not exist between these parties because they did not share profits, they did have a "joint cooperation agreement" very similar to a joint venture agreement. Thus, the type of fiduciary duties existing between these parties may be best understood by recognizing its analogy to a joint venture relationship.... In a joint venture situation, the fiduciary relationship arises when the parties begin their negotiations. In 46 Am.Jur.2d on Joint Ventures, the following general

statement is made as to *when* the fiduciary relationship arises:

> The fiduciary relationship upon which such obligations are consequent does not necessarily await the inception of the relationship as joint venturers. It may be predicated upon an arrangement to assume such a relationship. Thus, it is the plain and imperative duty of promoters of a syndicate, toward persons who are invited to cooperate in the enterprise, not only to abstain stating as a fact that which is not a fact, but not to omit to state any circumstances within their knowledge the existence of which might in any way affect the extent of quality of the advantages held out as inducements to the others.

46 Am.Jur.2d *Joint Ventures* § 50 (1969).

By analogy, the fiduciary relationship began between General Poly and Allied at the January 10, 1979 meeting when the parties agreed to enter a joint cooperation agreement and when Allied made certain representations about the extent of its resin development. Thus, at the time of the Peru test, Allied had a fiduciary duty to reveal the true source of the resin tested.

. . . .

Contrary to Allied's arguments, the evidence clearly shows that the parties did not have an ordinary buyer/seller relationship. When the parties' relationship began, Allied did not have a product to sell which General Poly could buy. In January of 1979, Allied represented to General Poly that it had developed an experimental resin but it still needed work. Allied needed General Poly's special equipment and specially trained people to help in this development. . . . Of course, unbeknownst to General Poly, Al-

lied had not in fact developed any type of resin at all.

*Id.* at 23–25 (emphasis in original).

In reaching its conclusion, the district court emphasized that Allied sought to benefit through its cooperation with General Poly by developing an HMW resin which it did not have at the time a fiduciary relationship was allegedly formed. *See id.* at 25. The district court was persuaded that the written agreement "is highly unusual and not that of a typical buyer/seller." *Id.* The court also felt that evidence showing General Poly agreed to buy offgrade resin in part to assist Allied was indicative of a fiduciary relationship. *Id.* Finally, the district court pointed to the testimony by Allied's Jecha and Snell that the General Poly arrangement was a "unique" one as evidence that a fiduciary relationship was formed. *Id.* at 26.[3]

The district court concluded its analysis of Allied's motion for judgment notwithstanding the verdict by reiterating the following statement made earlier in rejecting Allied's motion for directed verdict on General Poly's fiduciary duty claim:

> Mr. Traver's testimony just cries out as regards the parties' mutual trust and their mutual risk in finally reaching a commercial high molecular weight resin. I believe that his letter of July 8, 1981, says it all in [stating that such a relationship existed] between a party (sic). In my view, and given definition of a fiduciary, circumstances here are such that the jury may well find these parties were indeed fiduciaries. . . .

R. Vol. 41 at 4592.[4]

### 4. *Review of the District Court's Decision*

After carefully reviewing the evidence presented at trial, and viewing that

---

3. The district court also mentioned the fact that Allied intended to send a non-Allied HMW resin to the test in Peru as evidence that a fiduciary relationship existed between the parties. *Id.* at 26. However, it is unclear from the district court's order whether the evidence relating to the Peru test was considered as part of the analysis of the alleged duty or of the alleged breach of that duty.

4. The letter upon which the district court relied was written to Mr. Heath by Mr. Traver on July 8, 1981, and provides in relevant part as follows:

 Dear Paul:
 I believe that in the greatness (sic) of everyday business all of us concerned with the Allied–General Poly relationship have lost sight of what we did set out to do jointly two years ago: To develop for both companies a

evidence most favorably to General Poly (with all inferences drawn in its favor), we are unable to affirm the district court's ruling denying Allied's motion for judgment notwithstanding the verdict. Our review of the record does not disclose any sufficient evidence upon which a reasonable jury could properly conclude that General Poly had established the existence of a fiduciary relationship with Allied. Although we would reach this conclusion even if General Poly was required only to show the relationship by a simple preponderance of the evidence under Kansas law, our holding is compelled all the more strongly because under Kansas law General Poly was obligated to prove the fiduciary relationship by clear and convincing evidence.

None of the evidence reviewed above indicates that Allied ever consciously assumed fiduciary duties as to General Poly. As discussed in section one, a showing that Allied consciously accepted fiduciary duties is the *sine qua non* of General Poly's claim. The duties of a fiduciary are serious and many, and an agreement to assume such duties will not be presumed. *See Denison State Bank v. Madeira*, 230 Kan. 684, 695–96, 640 P.2d 1235, 1243–44 (1982).

▉▉▉ Relying on cases such as *Paul v. North*, 191 Kan. 163, 380 P.2d 421 (1963), and *Wolf v. Brungardt*, 215 Kan. 272, 284–85, 524 P.2d 726, 736 (1974), General Poly argues that the evidence at trial demonstrated that Allied and General Poly willingly and knowingly acted for one another's benefit "in a manner to impose mutual trust and confidence." *Wolf*, 215 Kan. at 284, 524 P.2d at 736. However, that argument ignores the central importance of the holding in *Denison*. Merely acting for one another's benefit will not give rise to fiduciary duties under Kansas law unless it is shown that the alleged fiduciary consciously assumed fiduciary responsibilities. Although the evidence at trial showed that Allied intended to act in a manner which would have consequential benefits for General Poly, nothing in the record suggests that any authorized representative of Allied ever intended to assume fiduciary duties on behalf of General Poly.

Neither the testimony of the Allied and General Poly representatives, their written correspondence and internal memoranda, nor the written agreement itself support General Poly's assertion that a fiduciary relationship existed. Reviewing the evidence in a manner most favorable to General Poly, all that was shown was an arm's length commercial relationship. The General Poly representatives told Allied of their plans to enter the film market using HMW HDPE resin. The Allied representatives told the General Poly representatives of Allied's plans to develop and perfect such a resin. General Poly agreed to make available its extrusion equipment for Allied to test its product. In exchange, Allied agreed to sell its HMW resin, once devel-

---

noteworthy participation in the exciting growth of high-density PE film. Allied's expertise in resin technology and its capital resources and GPC's efforts on the extrusion plant floor, as well as out in the marketplace, were to produce a film grade high-density resin equivalent to the best imported product. During these two years, as individuals and as companies, we all took substantial risk, suffered anxieties and failures, progressed and paid our dues for mistakes, as well as a success now in sight: An Allied film resin to be proud of....
We went together through the extended phase of resin testing while you did not have an extruder of your own. Whether at PeruPlast or General Poly, our people were at your disposal when you needed them. My fellow workers at General Poly, ... struggled with your people, Pat Snell and the others, through extrusion trial after trial sharing disappointments and the joys of the achievement.
Today success there is. You have arrived in the HD film resin markets and the industry knows it. You at Allied have reason to be proud of that, and while our contribution was minimal compared to your effort, we did do our bit.
We also tried our best to live up to our promise to use the materials originating from last year's start-up runs in your plant. Never did we complain to you about the frustrating difficulties we went through when your resin simply wouldn't make a salable film....
R. Vol. 30 at 2821–25 (testimony of Hans Traver reading Plaintiff's Ex. No. 1621 into evidence). The rest of the letter details General Poly's dire financial state and requests Allied's assistance in saving the corporation.

oped, to General Poly on favorable credit terms with a first right to purchase a specified quantity. The two corporations agreed that all disclosures between themselves made during this one year period of "joint cooperation" would be protected by a secrecy agreement binding for five years. Nothing in that course of conduct suggests that Allied ever intended to take on the many responsibilities of a fiduciary in its dealings with General Poly.

Allied was not shown to be acting "primarily for the benefit of" General Poly. To the contrary, it was openly and unabashedly developing its own capacity to produce HMW resin. *Denison*, 230 Kan. at 691–92, 640 P.2d 1241. Allied was not given and did not assume, any "influence over" General Poly other than the normal commercial arms length influence that suppliers and customers have over each other in the marketplace. *Id.* Allied did have superior knowledge of its own product and production capabilities, but that will be true of every supplier or potential supplier, and that is not sufficient to give rise to a fiduciary obligation. *Ritchie Enterprises v. Honeywell Bull, Inc.*, 730 F.Supp. 1041, 1054 (D.Kan.1990). None of General Poly's "property, interest or authority" was placed in charge of Allied. *Denison*, 230 Kan. at 691–92, 640 P.2d at 1241. The parties did place confidence in each other, but once again, that was a confidence based on commercial self-interest in which both parties had the power contractually to protect their own interests however they chose. Here, General Poly did not choose to obtain the contractual guarantees and rights that it now wishes it had. But, it can not imply fiduciary duties that were not clearly and convincingly assumed by Allied in order to cure its contractual deficiencies. *Wedman v. Home National Bank of Arkansas City*, No. 88–1439–K (D.Kan. Jan. 25, 1990) (WESTLAW, 1990 WL 7501) (J. Kelly) (citing *Denison* for the proposition that "when a person is competent and able to protect his own interests, he may not abandon all caution and responsibility for his own protection and unilaterally impose a fiduciary relationship on another without a conscious assumption of such duties by the other party."); *Pizza Management, Inc. v. Pizza Hut, Inc.*, 737 F.Supp. 1154, 1184 (D.Kan.1990) (J. Crow) (refusing to impose fiduciary duties on a franchisor under Kansas law: "In the setting of a commercial contract between two equally sophisticated business entities, this court is not prepared to impose heightened legal duties on one of the parties simply because that party may have more powers and discretion under the express terms of the agreement. Defendants are entitled to summary judgment on plaintiff's breach of fiduciary duty claims."); *Ritchie Enterprises v. Honeywell Bull, Inc.*, 730 F.Supp. 1041, 1053–54 (D.Kan.1990) (J. Crow) (refusing, under Kansas law, to find a fiduciary duty on behalf of a supplier of a computer system, even though the supplier has superior knowledge of his systems. "This court is unwilling to radically alter the given scheme of commercial dealings by the possible imposition of a fiduciary relationship upon a seller under these circumstances."); *LNS Investment Company, Inc. v. Phillips 66 Company*, No. 87–2215–0 (D.Kan. Aug. 29, 1989) (WESTLAW, 1989 WL 103637) (C.J. O'Connor) (refusing, under Kansas law, to imply a fiduciary relationship on a major purchaser of bottled motor oil who terminated a relationship with its supplier because of supplier's inability to provide the needed quantities of product.); *Adams Parker Furniture, Inc. v. Ethan Allen, Inc.*, No. 86–2113–5 (D.Kan. Oct. 13, 1987) (WESTLAW, 1987 WL 56676) (J. Saffels) (refusing, under Kansas law, to imply a fiduciary duty on a furniture manufacturer who terminated a distributorship even though the manufacturer had superior knowledge and power. "While [the manufacturer] certainly had a duty to meet any contractual obligations it owed to plaintiff, including a duty not to mislead plaintiff so it would detrimentally rely … it did not owe a duty to put [plaintiff's] interests before its own. It was not plaintiff's fiduciary, and therefore summary judgment … will be granted."). See also *Gillespie v. Seymour*, 14 Kan.App.2d 563, 796 P.2d 1060 (1990).

The evidence upon which the district court relied in denying Allied's motion for judgment notwithstanding the verdict is similarly inadequate. There was testimony by Allied representatives that the relationship with General Poly was "unique." However, that characterization falls far short of demonstrating that Allied intended to increase its duties from those inherent in a commercial transaction to the level of those which are imposed in a fiduciary relationship. Likewise, the letter by Mr. Traver which the district court pointed to as evidence of the fiduciary relationship does no more than summarize the interactions of the two corporations, interactions which we find inadequate to show Allied consciously accepted fiduciary duties. Therefore, we reverse the district court's order denying Allied's motion for judgment notwithstanding the verdict and order that judgment be entered in favor of Allied on this claim.[5]

## II. The Fraud Claim Arising From The Peru Test

On cross-appeal, General Poly challenges the district court's ruling directing a verdict in favor of Allied on General Poly's claim for fraud arising from the test of resin in Lima, Peru. At trial, General Poly alleged that Allied knowingly misrepresented the resin sent to Peru in March 1979 as its own, when in fact the resin was made by Solvay and Allied was using it pursuant to a licensing agreement. In directing a verdict against General Poly, the district court ruled that General Poly had failed to show Allied made a knowing misrepresentation with the intent to deceive and, in the alternative, that General Poly's claim was barred by Kansas' two-year statute of limitations because the claim was brought more than two years after the alleged fraud should reasonably have been discovered. R. Vol. 50 at 5682–83. We affirm the district court's order directing a verdict in favor of Allied.

### A. The Law of Fraud in Kansas

The law of fraud is well-established in Kansas:

> Where one party to a contract or transaction has superior knowledge, or knowledge which is not within the fair and reasonable reach of the other party and which he could not discover by the exercise of reasonable diligence, or means of knowledge which are not open to both parties alike, he is under a legal obligation to speak, and his silence constitutes fraud, especially where the other party relies upon him to communicate to him the true state of facts to enable him to judge of the expedience of the bargain.

*Wolf v. Brungardt*, 215 Kan. 272, 282, 524 P.2d 726, 734 (1974).

> "actionable fraud includes an untrue statement of fact, known to be untrue by the party making it, made with the intent to deceive or recklessly made with a disregard for the truth, where another party justifiably relies on the statement and acts to his injury."

*K–B Trucking Co. v. Riss Int'l Corp.*, 763 F.2d 1148, 1156 (10th Cir.1985) (quoting *Lentz Plumbing Co. v. Fee*, 235 Kan. 266, 270, 679 P.2d 736, 742 (1984)).

An action for fraud must be brought within two years of when it accrues, "but the cause of action shall not be deemed to have accrued until the fraud is discovered." Kan.Stat.Ann. § 60–513(a)(3) (1983). The Supreme Court of Kansas has interpreted discovery of the fraud under the statute of limitations to mean

> the discovery by the person defrauded of such facts indicating he had been defrauded as would cause a reasonably prudent person to investigate, and which, if investigated with reasonable diligence, would lead to knowledge of the fraud.

*Wolf*, 215 Kan. at 281, 524 P.2d at 734. Because the "modern tendency is to restrict rather than to expand the immunity of one who gains an advantage over another by purposely misleading him," *id.*, "[s]ome Kansas cases have rejected statute of limitations contentions when the plaintiff could have discovered the fraud, but

---

5. Because of our holding with regard to Allied's motion for judgment notwithstanding the verdict, we need not reach the claim that the jury instructions on fiduciary duty were improper.

the defendant lulled the plaintiff into confidence that nothing was amiss." *Wolf v. Preferred Risk Life Ins. Co.*, 728 F.2d 1304, 1306 (10th Cir.1984); *see, e.g., Augusta Bank & Trust v. Broomfield*, 231 Kan. 52, 61–62, 643 P.2d 100, 108 (1982).

B. The Evidence of Fraud

 The district court's directed verdict may only be sustained if viewing "the evidence most favorably to the party against whom the motion is made, and giv[ing] that party the benefit of all inferences," there is no "evidence upon which the jury could properly find a verdict for that party." *Hurd v. American Hoist & Derrick Co.*, 734 F.2d 495, 498–99 (10th Cir.1984) (quotations omitted). In making that determination, we must take into account the burden of proof for the underlying claim. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Under Kansas law, a claim of fraud "must be proven by clear and convincing evidence." *Nordstrom v. Miller*, 227 Kan. 59, 65, 605 P.2d 545, 552 (1980); *see Mackey v. Burke*, 751 F.2d 322, 328 (10th Cir.1984). The district court's alternative ground for directing a verdict in favor of Allied was the Kansas two-year statute of limitations. Therefore, we must also take into account Allied's burden of proof for the affirmative defense of the statute of limitations.

> [A] directed verdict for the party having the burden of proof may be granted only where he has established his case by evidence that the jury would not be at liberty to disbelieve.

*Hurd*, 734 F.2d at 499.

The evidence introduced at trial of the parties' original discussions concerning the shipment of experimental HMW resins to Traver's PeruPlast plant in Lima, Peru are set forth in the first subsection discussing General Poly's claim for breach of fiduciary duty. In addition, the following evidence relating to Allied's allegedly fraudulent misrepresentations of the PeruPlast test and the subsequent events which Allied contends should have reasonably caused General Poly to discover the alleged misrepresentations forming the basis of its fraud claim was introduced at trial.

On October 28, 1978, Pat Snell added a handwritten note to a memorandum addressed to Singleton from Jecha in which he indicated that he had spoken with Traver about supplying a "developmental" resin. *See* Plaintiff's Ex. 99 (Addendum to Appellee's Br., Doc. 3). Snell further explained:

> (This of course would be the rebagged [Solvay] B5920F). The resin would be ideal.
>
> I've told George Jecha of my conversations and he's aware of all developments.
>
> This could be a great opportunity to test the BF920F, test an Allied version of the same, and make an entry into the HDPE film market in the U.S.

*Id;* R. Vol. 20 at 1782.[6]

Pat Snell testified that in late January 1979, he contacted Traver's Houston office concerning the shipment of HMW resin to Traver's PeruPlast plant in Lima, Peru. *See* R. Vol. 20 at 1729. On February 16, 1979, Snell sent Traver a telegram requesting information on scheduling for the resin trials of the "new Allied resin." Plaintiff's Ex. S–114 (Addendum to Appellee's Br., Doc. 60). The shipping invoice which accompanied the five hundred and twenty-five pounds of resin shipped to Traver's PeruPlast plant indicated that the resin was "Paxon High Density Polyethylene." Plaintiff's Ex. S–116 (Addendum to Appellee's Br., Doc. 61). "Paxon" is a registered Allied trademark. *See* R. Vol. 20 at 1733.

The resin shipped by Allied was tested at the PeruPlast facility on March 26–27, 1979. The actual resin which was tested at the PeruPlast facility was not an Allied manufactured resin, but was instead Solvay B5920F purchased by Allied in Europe. *See* Plaintiff's Ex. 167 (Addendum to Appellee's Br., Doc. 9); Appellant's Br. at 7. The resin packaging did not identify it as a Solvay-manufactured resin because Allied had repackaged it in plain wrappers and

---

**6.** At trial, Mr. Snell explained that B5920F is "a Solvay high molecular weight high density film resin made in Europe. B5920F is their commercial designation for it." R. Vol. 20 at 1730.

placed an Allied internal reference number on it. *See* R. Vol. 20 at 1735. On September 19, 1979, Snell sent Traver a letter with data from "our testing on the film made from Allied chemical's developmental resin 6–100 (7–392) at your plant in Lima, Peru." Plaintiff's Ex. 142 (Addendum to Appellee's Br., Doc. 14).

Hans Traver testified that General Poly's executives were unaware that the resin tested at the PeruPlast plant was manufactured by Solvay until discovery in this litigation commenced. R. Vol. 25 at 2262. However, Allied maintains that General Poly should have known by September 1979, that Allied was at that time not yet capable of manufacturing a satisfactory Hoescht-quality HMW resin.

Hans Traver testified that in August 1979, he and Pat Snell began to make arrangements for a test of Allied's resin (along with resins from other manufacturers) at an extrusion plant operated in Natick, Massachusetts, by Alpine (a Swiss company). R. Vol. 25 at 2266. A test was conducted at the Alpine plant on August 23, 1979. *Id.* at 2267. Two representatives of General Poly attended the test. *Id.* at 2267–68. In a memorandum drafted four days after the test, the two General Poly representatives stated:

> Began test on Allied Chemical HDPE # 6–412 97. Pat Snell of Allied Chemical was present and coordinated the test with Max Gmahle of Alpine. The HS65 extruder ran satisfactory but the test was a failure due to the melt instability of the test resin. Pat said that he would have to redesign the resin.

Plaintiff's Ex. 386 (Addendum to Appellant's Br., Doc. 12). Peter Barber, an extrusion supervisor for General Poly, testified that after the disappointing Alpine test, Pat Snell of Allied explained the adjustments that Allied needed to make in order to improve the resin. *See* R. Vol. 33 at 3365. Snell told Barber that he thought it was possible for Allied to make the necessary adjustments, although he did not say how much time would be required. *Id.*

In addition to the Alpine test, Allied points to the September 21, 1979 agreement's reference to a one-year development program as proof that General Poly was aware Allied did not yet have a commercially viable HMW resin developed.

In February 1980, several Allied experimental HMW resins were tested using General Poly's extrusion equipment. R. Vol. 33 at 3366–69. According to Peter Barber, the Allied resins performed better than the resin tested at the Alpine plant in Massachusetts, but none were equal in quality to the industry standard Hoescht resin. *Id.* at 3369. Barber testified that Allied's Pat Snell told him Allied was "improving," getting "closer" and "near" to producing Hoescht-quality resin. *Id.* at 3369–70. Several other tests of Allied's resin samples were conducted at General Poly in 1980 and 1981, including a test on June 9, 1980 and one on September 18, 1980. *See* Appellee's Br. at 23, R. Vol. 33 at 3370, 3379.

General Poly placed its first orders for off-grade resin from Allied in June 1980. *See* Defendant's Ex. S–92 (Addendum to Appellant's Br., Doc. 83). A single rail car of resin mixed from several batches (the so-called "rainbow car") was shipped to General Poly by Allied and received by General Poly in July. R. Vol. 12 at 778–79. On July 7, 1980, General Poly received an invoice from Allied for resin shipped June 16, 1980, which identified the resin shipped as "Paxon Solvay Experimental PW" resin. *See id.* Subsequent shipments of off-grade resin ordered by General Poly from Allied were of inconsistent quality and had to be blended with Hoescht resin in order to be used effectively. R. Vol. 33 at 3237–39.

### C. The District Court's Ruling

The district court directed a verdict in favor of Allied on General Poly's fraud claim stating that:

> Solvay product was an Allied developmental product as Allied saw it. They did so knowing it was not true, a test of *Nordstrom [v. Miller,* 227 Kan. 59, 65, 605 P.2d 545, 552 (1980) ], is not shown, and they did so with an intent to deceive is not shown. I am convinced at this point in the case now, all parties rested,

there is no showing nor evidence whatsoever that at any point in time Allied ever intended to deceive anyone. I make those findings as I would construe the relationship of the parties as prospective, probably buyer-sellers in the commercial context, that is, the traditional setting between the parties.

Having said that, I needn't address the statute of limitation question, but it would appear to me that again in that setting, this event having occurred somewhere in March 1980 (sic), the parties were in concert with the reaching of some ultimate agreement. The parties were in communication from time to time. The awareness of the state of affairs with regard to the resin was clearly known to representatives of General Poly before even the signing of the agreement, but surely the signing of the agreement itself puts in place the time frame for the statute to run. And if as of that moment General Poly at any time believed they had been misrepresented and that such misrepresentation was deceiving, they were duty bound to proceed. I am convinced as well then that the statute, even should this representation apply, has run.

R. Vol. 50 at 5682–83.[7] Although some evidence was introduced from which fraud could be inferred with regard to the Peru test, it is doubtful whether such evidence ever approached a "clear and convincing" standard. The evidence of intent to defraud was only inferential at best and the evidence of falsity was ambiguous. Moreover, there was certainly evidence that Allied's labeling of the Solvay resin as its own experimental resin was within its rights under its license with Solvay; that the relabeling was within normal practices to ensure blind testing; and that there was

no intent to deceive. However, we do not base our affirmance on this ground. Rather, we affirm the court's ruling directing a verdict in favor of Allied because General Poly's claim is barred by the statute of limitations.

This alleged fraud took place in March 1979, when the rebagged Solvay resin was tested in Peru. The action for fraud was filed on August 17, 1982. R. Vol. 1, Doc. 1 at 20. Because the statute of limitations runs from the time when the fraud reasonably should have been discovered, the action would only be barred if discovery of the fraud should have reasonably occurred on or before August 16, 1980.

We believe that the disappointing results of the HMW resin tests conducted in August 1979, February 1980, and in June, 1980 "would cause a reasonably prudent person to investigate," and "if investigated with reasonable diligence, would lead to knowledge of the fraud." *Wolf,* 215 Kan. at 282, 524 P.2d at 734. The subsequent tests of Allied's samples inescapably put General Poly on notice that Allied was as yet incapable of reproducing the resin tested in Peru, and the entire course of conduct between the parties made it clear that, throughout that time period, Allied had not developed for commercial production any successful HMW resin. Yet, there is no evidence in the record indicating that General Poly's executives or engineers ever inquired as to the reason for that significant disparity.

This is not a case where the defendant "lulled the plaintiff into confidence that nothing was amiss" such that the failure to make inquiries is excusable. *Wolf v. Preferred Risk Life Ins. Co.,* 728 F.2d 1304, 1306 (10th Cir.1984); *see, e.g., Augusta Bank & Trust v. Broomfield,* 231 Kan. 52, 61–62, 643 P.2d 100, 108 (1982). Various

---

**7.** In an earlier statement made explaining that a ruling on the motion for a directed verdict on this claim would be taken under advisement the judge remarked,

I have said in this case it struck me in either event, before this plant was opened, the plaintiffs were made aware that the Defendant was indeed not ready to deliver a product consistent with that which was shown to them or represented to them at Peru, and under-

standing this, I think I also said the statute of limitations probably has run, and certainly by the time they had signed off on the contract, even in the face of the misrepresentation, didn't the Plaintiffs know full well that whatever it was that was produced at Peru was not available for delivery then and hadn't the statute run.

R. Vol. 41 at 4590.

Allied representatives made statements which optimistically characterized Allied's progress in its efforts to develop a Hoescht-quality HMW resin. However, General Poly's attempt to portray those statements as false assurances justifying its inaction ignores the fact that General Poly had knowledge of Allied's actual progress by virtue of the test results of Allied's resins. Therefore, this case is distinguishable from cases such as *Dreiling v. Home State Life Ins. Co.*, 213 Kan. 137, 145–46, 515 P.2d 757, 765 (1973), and *Augusta Bank & Trust*, 231 Kan. at 61–62, 643 P.2d at 108, where the fraud went undetected because the defendant made affirmative misrepresentations such that the plaintiff had no independent reason to make further inquiries.

General Poly contends that even though it made no inquiries into the reason for the inconsistent test results obtained from Allied's resin samples, Allied is unable to satisfy its burden of showing that no reasonable jury could conclude that General Poly did not learn of the allegedly fraudulent acts prior to August 1980. *See Wolf,* 728 F.2d at 1306–07 (in an action for fraudulent representations concerning the coverage of an insurance contract a material factual dispute existed as to whether the fraud was discovered when plaintiff actually learned of the misrepresentations or when the plaintiff reasonably should have discovered the disparity in coverage). General Poly argues that because there is no evidence in the record indicating that Allied would have disclosed that the HMW resin tested in Peru was manufactured by Solvay if General Poly had inquired, discoverability may not be presumed.

In *Waite v. Adler*, 239 Kan. 1, 6–7, 716 P.2d 524, 528 (1986), the Supreme Court of Kansas recognized that in certain circumstances knowledge of allegedly fraudulent acts may be presumed. In *Waite,* an action was brought against a bank officer for making allegedly fraudulent statements about the credit standing of an automobile dealership in which the plaintiff then invested. *Id.* at 1–3, 716 P.2d at 524–25. Although the jury returned a verdict for the plaintiff, the court reversed based on

the statute of limitations. The court held that the plaintiff should have known of the dealership's precarious financial situation when, more than two years before the action was commenced, the bank took possession of the dealership inventory. *Id.* at 7, 716 P.2d at 528. Although the repossession of cars did not directly establish the falsity of the earlier statements made by the bank, the court concluded that the earlier statements all went to the general subject of the creditworthiness of the dealership and tended falsely to misrepresent such creditworthiness. The subsequent foreclosure put the plaintiff on notice that the general creditworthiness was not as implied by the earlier statements and, consequently, imposed upon him a duty to investigate the truth of the earlier statements.

In this case, General Poly could not have helped but know by August 1980 that Allied was not able consistently to produce or even to reproduce for an isolated test high-grade resin such as that used in the Peru test. Viewing the evidence presented in the light most favorable to General Poly, we hold that no reasonable jury could have properly found that prior to August 1980, General Poly was without knowledge of Allied's inability to produce resin of the quality of that tested in Peru on an ongoing basis. Because General Poly's action for fraud was based entirely on Allied's alleged fraudulent concealment of that information, we affirm the district court's ruling directing a verdict in favor of Allied based on the statute of limitations.

### III. *The Fraud Claim Arising From the Rail Car Exchange*

General Poly also appeals the district court's ruling directing a verdict in favor of Allied on a separate claim of fraud. Essentially, General Poly alleged that Allied defrauded General Poly by taking return of two rail cars of off-grade resin which General Poly had pledged as collateral and then reneging on its commitment to replace the cars with two cars of premium grade (or at least better grade) resin before the time General Poly was

obligated to report the status of its collateral to the bank. In analyzing General Poly's cross-appeal of the directed verdict on this claim, we apply the principles of Kansas' law of fraud and the standards for reviewing a directed verdict set forth in the previous subsection.

### A. The Evidence Presented

According to General Poly, the following evidence presented at trial was sufficiently clear and convincing such that a reasonable jury could have properly ruled that Allied acted fraudulently. On June 3, 1981, Allied's George Jecha and Kurby E. Wiley met with General Poly's Traver and Walker at the General Poly plant. *See* R. Vol. 27 at 2442; R. Vol. 29 at 2642. Wiley asked Traver's opinion of a batch of new Allied resin which had been tested at General Poly the month before. R. Vol. 27 at 2442–43. Traver testified that when he expressed his satisfaction with that resin, Wiley asked "[h]ow would you like it if we would exchange those three hopper cars that you have sitting out there on your spur for this new material?" *Id.* at 2443. Traver agreed, remarking "[l]et's do it." *Id.* Traver testified that another General Poly employee informed him that one rail car had been partially used and suggested that only the two unopened cars be returned. *Id.* at 2444. Traver testified that Walker told the Allied representatives that those cars were pledged as collateral and that any exchange would need to be completed before the end of the month and that Wiley responded by stating "[w]e can do that." *Id.* Traver further testified that Wiley said "[l]et's exchange the cars. We will take them back and we'll send you new material." *Id.* at 2445.

Traver testified that he then dictated a memorandum in the presence of Wiley and Jecha. *Id.* That memorandum provides, in relevant part, as follows:

1. General Poly is to return hopper cars # GCX0945258 and # GCX0945205, for a credit of $129,701. This credit is to be applied against the *oldest outstanding invoices.* The remaining debt payable

will be between $170,000 and $180,000, none of which is due at this time.

. . . .

2. Allied will replace the two cars with two cars of the run 13103 and/or 154008, ETA June 22 to June 30 at IAK, *at the same price* as the two wide spec [ (i.e., offgrade) ] cars returned to Allied.

Plaintiff's Ex. 1545, Addendum to Appellee's Br., Doc. 34 (emphasis added). However, Traver testified that Wiley had indicated he would have to secure his superiors' approval of both the price of the new resin and the particular invoices to be credited for the returned cars. R. Vol. 29 at 2644–45. On June 11, 1981, Traver wrote a letter seeking to confirm the agreement to Allied's Wiley, Heath and Jecha. *See* Plaintiff's Ex. 1561, Addendum to Appellant's Br., Doc. 31. R. Vol. 29 at 2649–52. That letter provides, in pertinent part, as follows:

Dear George:

This is to confirm our conversations when you visited our offices last week. You will take back hopper cars GCX945258 and GCX945205, invoices 0944–6198 and 0944–7210 for $61,916.40 and $64,216.80. You will issue us corresponding credit memos, which we can apply to future purchases.

I will issue to you a purchase order for the new material of the runs tested last month, and we shall specify on the order the arrival. At least one hopper car should be here by June 30.

Plaintiff's Ex. 1561, Addendum to Appellant's Br., Doc. 31. Sometime after June 11, 1981, Allied's Kurby Wiley spoke with Traver by telephone and advised him that the resin tested at General Poly in June was not available for shipment to General Poly. On June 25, 1981, Traver wrote George Jecha the following letter:

Dear George:

Shortly after you left, we received a phone call from Kurby, who advised me as follows:

1.) The material which we tested here in our plant and liked very much, namely

lot # 103 [8] and lot # 154008, were never available in hopper car quantities.

2.) At this time, there is only one hopper car of prime material, impact strength 320, which would not meet our needs, in any event costing 48¢.

3.) There was a hopper car available with an impact strength of 260, classified as off-grade at 38¢. This is the material for which we have placed purchase order # 670, and for ease of identification we designated the resin as 4100–260.

Kurby further explained that with the current impact test, those lots with an impact strength of 380–420 were considered prime, but that no such resin was available in hopper cars at that time. I am still not quite sure what constitutes prime, but we will proceed on the assumption that prime signifies a dart impact of 380—420 grams, with the exception of the above mentioned hopper car with an impact strength of 320.

Kurby also explained that you expect to make a new run in July.

In view of the above, I see the situation like this:

1.) At this time, Allied has no prime resin with the properties we are looking for.
2.) We are again placing an order for splity (sic) resin, which we will need to blend off with a competitive material.
3.) We need to wait til (sic) after the July run to know what resin properties we can expect from Allied.
4.) Your price for prime, when available, will be 48¢.

Plaintiff's Ex. 1586, Addendum to Appellant's Br., Doc. 32.

Allied's Paul Heath testified that although Wiley informed him that General Poly's representatives had said the two cars being returned were pledged as collateral, he did not believe that General Poly could have pledged assets not yet paid for as collateral. R. Vol. 31 at 2934. Heath further testified that prior to the time the two rail cars were picked up from General Poly it had already been decided that they would not be replaced. *Id.* at 2938. The two rail cars of resin were picked up at General Poly's facility on June 18, 1981 and June 26, 1981. R. Vol. 29 at 2678. No replacement cars were ever delivered to General Poly from Allied. R. Vol. 27 at 2451.

Timothy Stanton, who served as an officer of the Commerce Bank in 1981, testified that when Traver told him of the two cars of resin which had been returned to Allied and not replaced, the bank informed General Poly that it would extend the corporation no further credit and that receivables deposited at the bank would be marshalled in part for the payment of outstanding indebtedness. R. Vol. 35 at 3600, 3620–21.

### B. The Law Regarding Fraudulent Statements of Intent to Act in the Future

This court has previously recognized that [u]nder Kansas law, "[w]hen alleged fraud relates to promises or statements concerning future events, the gravamen of such a claim is not the breach of the agreement to perform, but the fraudulent representation concerning a present, existing intention to perform, when such intention is in fact nonexistent."

*Mackey v. Burke*, 751 F.2d 322, 328 (10th Cir.1984) (quoting *Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.*, 226 Kan. 70, 78, 596 P.2d 816, 824 (1979)). In *Mackey*, the plaintiff sold the defendants a number of Holstein heifers, many of which the defendants later learned were too ill to be exported to Korea when they attempted to ship them from Seattle, Washington. *Mackey*, 751 F.2d at 324. The defendants stopped payment on the check to the plaintiff, and the plaintiff called the Seattle Port Authority to prevent shipment of the cows. However, one of the defendants later persuaded the plaintiff to allow the shipment by promising to return to Kansas and straighten everything out. The defendant never returned to Kansas as promised. Applying *Modern Air Conditioning*, the court in *Mackey* held that the "plaintiffs failed to present any clear evidence at trial

---

**8.** Apparently, this is either a typographical error or a shorthand reference to lot # 13103.

that [the defendant] did not intend to return to [Kansas] at the time that he made the promise." *Id.* at 328. Thus, the punitive damage award based on fraud was reversed. *Id.* at 328–329.

In this case, the district judge entered a directed verdict against General Poly on its fraud claim without specifying the basis of his ruling. The court simply stated, "I see no basis for fraudulent misrepresentation." R. Vol. 41 at 4596. When defendant's counsel inquired further as to the court's ruling on "the hopper car replacement issue," the court answered, "I don't see that as fraudulent misrepresentation" and proceeded to direct a verdict in favor of Allied. *Id.* at 4597. Although the district court did not elaborate on its analysis, we hold that the court reached the correct conclusion.

General Poly asserts that on June 3, 1981, Allied's Wiley had no present intention to effect a swap when he proposed an exchange of off-grade rail cars for rail cars containing resin equivalent to that tested in the May test. However, even viewing the record in the light most favorable to General Poly, we find only a single piece of evidence which even arguably supports that conclusion—the statement by Hans Traver in his July 25, 1981, letter to George Jecha that Wiley had informed him that "[t]he material which we tested here in our plant and liked very much, namely lot #103 and lot #154008, were never available in hopper car quantities." Plaintiff's Ex. 1586, Addendum to Appellant's Br., Doc. 32. General Poly is unable to point to *any* evidence whatsoever in the record which would suggest that Wiley knew the promised upgraded resin was unavailable at the time he made the offer to exchange. The testimony that Allied's Heath had decided not to replace the two cars prior to the time they were picked up is unavailing because there was no evidence suggesting that Heath communicated that intent to Wiley before Wiley made representations concerning the exchange to the General Poly representatives. Furthermore, Heath only testified that he had decided not to provide replacement cars prior to the time the two off-grade railcars *were picked up*. Nothing in his testimony suggests that he

or anyone else at Allied had formulated such an intent as of the earlier time when Wiley told Traver that replacement cars would be shipped. Therefore, because General Poly presented no evidence, much less clear and convincing evidence, indicating that at the time Wiley suggested the exchange to General Poly he did not intend to carry through with his proposal, we affirm the district court's ruling entering a directed verdict in favor of Allied.

## IV. *The Conversion Claim Arising From The Rail Car Exchange*

General Poly brought a separate claim against Allied for conversion based on Allied's allegedly wrongful appropriation of the two rail cars of off-grade resin which were returned. The district court directed a verdict in favor of Allied on this claim without any explanation of the basis for the ruling. *See* R. Vol. 41 at 4596.

In Kansas, as elsewhere, conversion is defined as "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another" resulting in some "actual interference with" the rightful owner's possession of property. *Desbien v. Penokee Farmers Union Coop. Assoc.*, 220 Kan. 358, 365, 368, 552 P.2d 917, 924, 926 (1976). However, as General Poly concedes, there is undisputed evidence that General Poly's representatives consented to Allied's acquisition of the two cars. Although generally "[o]ne who would otherwise be liable to another for ... conversion is not liable to the extent that the other has effectively consented to the interference with his rights," *Restatement (Second) of Torts* § 252 (1965), it is well-established that "[c]onsent to possession of a chattel obtained by fraud or duress is not effective to prevent recovery ... for conversion." *Id.* at § 252A.

General Poly argues that the Allied representatives fraudulently induced General Poly's consent to the return of the two rail cars. However, as discussed above, General Poly did not present sufficient evidence to withstand Allied's motion for a directed

verdict on the fraud claim. Consequently, General Poly's assertion of fraudulently induced consent must likewise fail.[9]

## V. The Contract Claims

### A. Breach of the Written Agreement

General Poly's next argument on appeal is that the district court improperly directed a verdict in favor of Allied on General Poly's claim for breach of their written agreement. In directing a verdict in favor of Allied, the district court explained his reasoning as follows:

> [A]s I listened to Plaintiffs' evidence, it seemed clear to me that if it was a claim for breach of contract, it was in part because the Plaintiffs had ordered and reordered time and again certain off-weight resins from Allied, received them, knowing they were off-weight, accepted them as off-weight, used them without any remonstration or complaint or attempts to set aside the terms of the agreement or to claim that the terms had been breached. I have always then been persuaded, if this case is premised in its commercial setting, that the provisions of Section 2–606 through 608 probably control this case, and as a consequence, Plaintiffs had no breach of contract.

R. Vol. 41 at 4587–88.

General Poly argues that the district court's ruling was erroneous because "[t]here was unequivocal evidence that Allied had commercial quantities of prime resin available in May–June 1981, which it sold to others before offering [it] to General Poly.... That conduct directly breached the written 'first right to purchase' term of [the written agreement]." *See* Appel-

lee's Br. at 86.[10] The first right of purchase provision provides as follows:

> 1.2 For a period commencing with the production by Allied Chemical of a semi-commercial or commercial scale of any new high density polyethylene film grade resin developed and terminating three (3) years thereafter, it is agreed that General Poly shall have the first right to purchase such high density polyethylene film grade resin from Allied Chemical up to a maximum of 500,000 pounds per month. General Poly's first right to purchase film grade pursuant to this Section 1.2, however, shall be contingent upon General Poly giving Allied Chemical at least thirty (30) days' prior written notice of its requirements for each calendar month in which General Poly chooses to exercise its first right to purchase. With respect to each calendar month for which Allied Chemical receives no written timely notice, as provided for herein, Allied Chemical shall be relieved of any obligation to General Poly.

Plaintiff's Ex. 420, First Addendum to Appellant's Br., Doc. 14. Because the written agreement states that it "shall be governed by and construed in accordance with the internal laws of the State of New York without regard to conflict of laws," we must apply the law of New York. *Id.*

### 1. Sufficiency of the Evidence of Breach

We believe the district court correctly entered its ruling directing a verdict in favor of Allied. The district court based its conclusion on Sections 2–606 through 608 of the Uniform Commercial Code

---

**9.** Although it is not essential to our holding, we note that even if General Poly were able to establish fraud so as to invalidate its consent to return of the first car, Traver's letter of June 25, 1981, evidences his actual knowledge that Allied lacked prime resin such that consent to removal of the rail car picked up the very next day could not have been fraudulently obtained.

**10.** Allied maintains that General Poly has waived this argument. *See* Reply/Answer Brief of Appellant at 65–66. However, in denying Allied's motion for summary judgment on the claims for breach of the written agreement, the district court stated that "plaintiff claims the

first right to purchase provision in the September 21 agreement was breached by Allied when it 'withheld resin ... suitable for General Poly for months, while attempting to move such resin to General Poly's competitors.'" *Rajala v. Allied Corp.,* 66 B.R. 582, 597 (D.Kan.1986) (quoting Pretrial Order at 5). Thus, it is clear that the claim for breach of the first right of purchase provision was raised below and has not been waived on appeal. Nevertheless, we affirm on the ground that General Poly failed to present sufficient evidence of breach to withstand Allied's motion for a directed verdict.

("U.C.C."), and we believe those provisions establish that General Poly has no breach of contract claim for the off-grade resin that was delivered to it and accepted by it under the contract. With regard to the claim that Allied was delivering prime grade resin to General Poly without making such resin available to General Poly, in May and June, 1981, we observe that the terms of the written agreement specify that unless General Poly gives Allied thirty days *written* notice of its needs for the calendar month, no first right of purchase shall inure for that month. We hold that General Poly's failure to supply such notice precludes General Poly from asserting this breach of the agreement.

General Poly first argues that it was not required to give Allied written notice of its resin needs because Allied failed to notify General Poly of the available resins. In the alternative, General Poly suggests that its communications with Allied did constitute notice so as to satisfy its obligations under the written agreement. However, the record does not support either of those arguments.

General Poly contends that it was not obligated to give Allied written notice until such time as Allied first notified General Poly that resin was available. This position is untenable for two reasons. First, it is clear from the record that the AFK–9 PAXSON 4100 resin which General Poly complains was sold to other companies in breach of the agreement was first tested at the General Poly facility. Although General Poly evidently was not satisfied with the quality of the resin from that run, it cannot now argue that it did not have notice of its existence. Second, even if the record were otherwise, we are unwilling to read into the written agreement an obligation on the part of Allied to notify General Poly of the availability of prime resin, because no such provision appears in the clear and unambiguous language of the agreement. *See Meccico v. Meccico,* 559 N.Y.S.2d 974, 76 N.Y.2d 822, 559 N.E.2d 668 (1990) ("Where the contract is clear and unambiguous on its face, the courts must determine the intent of the parties from within the four corners of the instrument."); *cf. Remetich*

*v. Remetich,* 110 A.D.2d 760, 488 N.Y.S.2d 49 (1985) (plaintiff failed to exercise an option to purchase "in the clear and explicit manner stated in the separation agreement").

General Poly argues in the alternative that it did in fact notify Allied of its resin needs. However, General Poly does not call our attention to any evidence in the record suggesting that it gave Allied any kind of written notice for either of the months for which it now alleges breach (i.e., May and June 1981). The three exhibits which General Poly cites are unavailing. The first letter General Poly relies on is a letter from Traver to Heath written on September 19, 1980. Plaintiff's Ex. 1088, First Addendum to Appellee's Br., Doc. 20. The letter indicates that General Poly would be willing to purchase "[t]he two hopper cars which you have available" and requests a meeting to "work out with you a purchasing program for 1981." *Id.* The second exhibit General Poly relies on is an order for seven hopper cars of offgrade resin to be blended with Hoescht resin. Plaintiff's Ex. 1276, First Addendum to Appellant's Br., Doc. 24. The proposed shipping dates for those cars are listed as between February 9, 1981, and April 24, 1981. *Id.* The final exhibit referenced by General Poly is Traver's June 2, 1981 letter in which he inquired as to the availability of the resins which he found to be satisfactory but which contains no written statement of General Poly's requirements nor does it contain an order for material. Plaintiff's Ex. 1544, First Addendum to Appellee's Br., Doc. 33. None of these documents shows that General Poly ever gave Allied written notice of its resin needs for the months of the alleged breach—May and June 1981. "It is a basic tenet of contract law that before liability can arise on a promise qualified by conditions expressed or implied in fact, such conditions must be fulfilled." *Morse v. Ted Cadillac, Inc.,* 146 A.D.2d 756, 756, 537 N.Y.S.2d 239, 240 (N.Y.App.Div.1989) (quotations omitted). Because sufficient evidence was not presented such that a reasonable jury could properly have found that General Poly had

fulfilled its notice obligations under the agreement, we hold that the district court properly directed a verdict in favor of Allied on General Poly's action for breach of the written agreement.

### B. Breach of the Oral Contract

The last of General Poly's arguments which we address is that the district court incorrectly directed a verdict in favor of Allied on the claim for breach of oral agreements. General Poly alleges that Allied and General Poly entered into an oral agreement whereby "Allied would: (i) deliver an HMW resin by the end of 1979; (ii) develop a Hoescht-quality resin by that time; (iii) sell the new resin to General Poly on 90–day credit terms; and (iv) sell it to General Poly for one to two cents over the price of injection molding." Appellee's Br. at 86. According to General Poly, Allied breached these agreements because "the prime resin was not ready for delivery by the end of 1979, Hoescht-quality was not reached until May 1981, and then Allied cut off all credit." *Id.*

The text of the district court's ruling is set forth in the previous subsection. The district court concluded that because General Poly accepted the off-grade resin without notifying Allied that it considered delivery of such goods to constitute breach, General Poly's claim for breach of the oral agreement was barred under sections 2–606 through 2–608 of the U.C.C. In addition, the district court stated,

> As to the oral contract, which is suggested here as terms reached in January of '79, and which go hand in glove with the written agreement, I have also said in this case, again in the commercial setting, that there is no showing here that Defendants, through their representatives, have accepted them, particularly that portion which would address price or time of delivery. Simply said: there has been no meeting of minds shown.

R. Vol. 41 at 4588.

General Poly argues that the following evidence presented at trial constituted "direct evidence" of Allied's agreement to the terms of the oral contract. According to

the testimony of General Poly's Hans Traver, Allied's Bonin stated that the ninety-day credit terms were deliberately omitted from the secrecy agreement to avoid the risk of other Allied customers discovering General Poly's favorable relationship with Allied. R. Vol. 11 at 664. On January 11, 1979, Allied's Bonin drafted a file memorandum in which he wrote that the General Poly representatives "indicated they would buy at least 50% and possibly all their resin requirements from Allied if we have a satisfactory product when they start up in October 1979." Plaintiff's Ex. 129 (First Addendum to Appellee's Br., Doc. 6 at 2). On January 23, W.P. Prince, a technical manager at Allied, wrote an Allied internal memorandum in which he stated "General Poly has agreed to work with us in developing HDPE film resins. Indications are that we can obtain 50% of their business if we have a suitable material by the time they start up in late 1979." Plaintiff's Ex. 138, Addendum to Appellee's Br., Doc. 9; *see* R. Vol. 11 at 650 (testimony of Hans Traver); R. Vol. 24 at 2231–32 (same). Finally, a promotional article approved by Allied's Paul Heath claimed that "General Poly received a promise from Allied Chemical that a domestic supply of HMW HDPE would be available by the time the company began operation." Plaintiff's Ex. 1364, Addendum to Appellee's Br., Doc. 28; *see* R. Vol. 31 at 2981 (testimony of Paul Heath).

This evidence is not sufficient to establish specific terms of an oral argument, particularly with regard to price, terms of delivery, quality, and quantity, such that a jury could conclude that the parties had a meeting of the minds on an oral agreement. Further, the oral agreement that General Poly now asserts is contrary to the written agreement and the conduct of the parties. In addition, the district court's ruling may be affirmed because General Poly accepted the off-grade resin without notifying Allied that delivery of the nonconforming goods constituted a breach.

The district court determined that General Poly "ordered and reordered time and again certain off-weight resins from Allied, received them, knowing they were off-

weight, accepted them as off-weight, used them without any remonstration or complaint or attempts to set aside the terms of the agreement or to claim that the terms had been breached." R. Vol. 41 at 4587–88. The court concluded that such conduct barred General Poly's action for breach of the oral contract under U.C.C. provisions §§ 2–606, 2–607 and 2–608.

The U.C.C., as incorporated by Kansas,[11] provides:

> Where a tender has been accepted the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or *be barred from any remedy.*

Kan.Stat.Ann. § 84–2–607(3)(a) (1983) (emphasis added). As the district court noted, General Poly repeatedly ordered the off-grade resin from Allied without ever suggesting that the failure to deliver prime resin on favorable terms by the fall of 1979 breached the oral agreements. General Poly is unable to direct our attention to any evidence in the record demonstrating that it notified Allied that it regarded delivery of the off-grade resin to constitute a breach. Instead, General Poly argues that its acceptance of the off-grade resin was "cover" under Kan.Stat.Ann. § 84–2–712(1) (1983).

Although a buyer may obtain cover from the breaching seller, that in no way removes the buyer's obligation to notify the seller of the alleged breach after a tender under Section 2–607(3)(a). Moreover, Section 2–712(1) states that a buyer may seek cover only after a breach under Section 2–711. A breach within Section 2–711 only occurs where "the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance." Kan.Stat.Ann. § 84–2–711(1) (1983). General Poly is unable to point to evidence in

the record upon which a reasonable jury could properly find that it rejected the off-grade resin tendered by Allied because it was in violation of the asserted oral contract or otherwise notified Allied that it regarded delivery of such goods as a breach of the asserted oral contract. For all these reasons, we affirm the district court's ruling directing a verdict in favor of Allied on this claim.

## SUMMARY AND CONCLUSION

We REVERSE the judgment in favor of General Poly on the claim for breach of fiduciary duty. We AFFIRM the district court's ruling directing a verdict in favor of Allied on General Poly's claims for fraud. We AFFIRM the directed verdict on the conversion claim. We AFFIRM the district court's ruling directing a verdict in favor of Allied on General Poly's claim for breach of the written agreement. Finally, we AFFIRM the directed verdict on the oral contract claim. We do not reach any of the other issues raised by the parties because the foregoing rulings and the subsidiary rulings contained therein are dispositive of these appeals. Accordingly, the case is REMANDED to the district court with orders that judgment be entered consistent with this opinion.

**11.** As discussed above, the written agreement contains a choice of law provision stipulating that the law of New York shall govern all disputes. In denying Allied's motion for summary judgment on the oral contract claim, the district court applied New York law in deciding the parole evidence questions. *See Rajala v. Allied Corp.,* 66 B.R. 582, 589–598 (1986). However, on appeal neither party has suggested that New York's law controls the independent oral contract claim. Rather, both parties have cited with approval the provisions of the U.C.C. incorporated in the Kansas statutes. *See* Appellant's Reply Br. at 67 n. 104; Appellee's Br. at 87, n. 80. In any event, because the relevant provisions of the U.C.C. under the New York Statutes are identical to those of Kansas, we need not decide the choice-of-law question. *See* N.Y. *U.C.C. Law* §§ 2–607, 2–712 (Consol.1990).