Rodger M. ARST, Plaintiff,

v.

STIFEL NICOLAUS & COMPANY, INC.; and Odis E. Shoaf, Jr., Defendants.

No. 93–1299–PFK.

United States District Court, D. Kansas.

Dec. 2, 1994.

Roger Sherwood and Kurt A. Harper, Sherwood & Harper, David G. Arst, Arst & Loyd, Wichita, KS, for plaintiff.

Reggie C. Giffin, Morrison & Hecker, Kansas City, MO, and John C. Nettels, Jr., Morrison & Hecker, Wichita, KS, for defendants Stifel, Nicolaus & Co. and Odis Shoaf.

James A. Walker, Triplett, Woolf & Garretson, Wichita, KS, for defendant Odis Shoaf.

### MEMORANDUM AND ORDER

PATRICK F. KELLY, Chief Judge.

This matter comes before the court on the motion for summary judgment by the defendants, Stifel, Nicolaus & Co., Inc. (Stifel) and Odis E. Shoaf, Jr. A hearing was held on October 17, 1994, and the court now is ready to rule upon the motion.

The plaintiff, Rodger M. Arst, purchased 37,500 shares of Physician Corporation of America (PCA) stock for $2.00 per share in the 1980s. One of the reasons Arst invested in PCA stock was because he earlier had profited from buying and selling Health Care Plus (HCP) stock, and because Dr. E. Stanley Kardatzke, who previously had been involved with HCP, was associated with PCA. Prior to the PCA investment, Arst had invested in oil and gas leases, commercial office space, and rental housing. He also had invested, on at least one occasion, in "start up companies" or public offerings of companies. As of August 1992, Robert Wilkins of Prudential Securities (Prudential) had been Arst's broker for approximately 15 years. The average amount of Arst's account with Prudential was $15,000.00 to $20,000.00. Arst and Wilkins had frequent discussions about stocks and other investments and occasional discussions about nonPrudential products. Wilkins believed Arst understood these discussions and described as average Arst's ability to discuss and evaluate the risks and rewards. Wilkins and Arst never discussed whether Arst should sell his PCA stock; the broker was not aware Arst owned PCA stock until after it was sold.

In its October 13, 1989 prospectus, PCA offered to repurchase shareholders' stock at $1.00 per share and stated, " 'Management of the company intends to create a trading market for the company's shares at some future point if the Company's profitability and growth permits. However, there can be no assurances that such a trading market will be established.' " (Defs.' Motion, Fact Nos. 9, 11; Pltf.'s Response, at 3.) Arst received a copy of the prospectus, but did not sell his shares at that time.

PCA management intended to have its stock traded on a public exchange as soon as feasible. To assist PCA in accessing public markets, management hired as general counsel John Hageman, who had experience in securities law. Prior to 1990, PCA's legal department handled all transactions involving PCA stock.

In 1990, Hageman, on behalf of PCA, asked Stifel to act as a market maker. Although there had been contact between PCA

and Stifel/Shoaf prior to 1990, no formal relationship had been established. The duties of a market maker include:

(1) to carry an inventory of the stock; (2) to buy the stock at the quoted "bid" price; (3) to sell the stock at the quoted "ask" price; (4) to do a certain amount of due diligence investigation on the company; (5) to have met with senior management; (6) to follow the industry and the company; and (7) to disclose on the confirmation that it was acting as a principal not an agent.

(Defs.' Motion, Fact. No. 23 & Sept. 23, 1994 Letter of Correction; Pltf.'s Response, at 6.) Stifel declined to serve as a market maker for PCA stock, but agreed to "act as an accommodating broker on an agency basis." (Defs.' Motion, Fact No. 23; Pltf.'s Response, at 6.) An accommodating broker handles transactions only on an unsolicited basis; makes no recommendations on whether to hold, sell, or buy stock; and does "not make a market in the stock." (Defs.' Motion, Fact. No. 24; Pltf.'s Response, at 6–7.)

PCA notified its stockholders in a mailing, which Arst received, stating that PCA had "made arrangements for Stifel Nicolaus & Company to accommodate the purchase/sale of the Company's stock between individual shareholders" and that if shareholders were interested in buying or selling, they should contact Shoaf at Stifel. (Defs.' Motion, Fact. No. 25; Pltf.'s Response, at 7–8.) Arst also received mailings from PCA discussing the company's financial condition and performance as well as the company's projected future performance.

Shoaf received the mailings sent to shareholders. There is no evidence Shoaf or Stifel had access to PCA personnel or to nonpublic information not available to shareholders.

After Stifel agreed to act as an accommodating broker, Shoaf kept a list of PCA stockholders who communicated their interests in either selling or buying. At his initial contact with a stockholder, Shoaf routinely would explain that Stifel was acting as an accommodating broker, not a market maker; that he would put PCA shareholders who wanted to sell in contact with shareholders who wanted to buy; that he would inform stockholders of the price of the latest trade; and that if the buyer and seller agreed upon a price and a trade resulted, both would pay a commission to Stifel. If asked, Shoaf would share the most recent financial information PCA had sent. Stifel instructed Shoaf never to say anything shareholders could construe as a recommendation, inducement, or solicitation to sell, hold, or buy PCA stock. Because Stifel was serving as an agent for both buyer and seller, Stifel wanted Shoaf to remain neutral and to provide only public information to the shareholders. The defendants agreed Shoaf should never mention the fact Shoaf and his family were purchasing PCA stock because stockholders might construe that as a recommendation to hold or to buy PCA stock.

Between October 1990 and September 1992, Stifel handled 20–plus transactions involving the exchange of over 250,000 PCA shares. In five of those transactions, Shoaf purchased part of the shares offered for sale. He bought a total of 10,843 shares. Shoaf bought PCA stock because he thought the health care industry was a good investment and was aware of Kardatzke's successful track record with HCP. On one occasion, Shoaf's three children purchased a combined total of 1,221 shares. Shoaf maintains that he and his family members paid the same price as the other buyers and that he purchased remaining shares other buyers did not buy.[1] There were instances in which

1. Citing several trades as examples, Arst unsuccessfully attempts to controvert that Shoaf paid the same price. The document upon which Arst relies indicates that on November 7, 1990, Shoaf and another purchaser each bought 3,000 shares at $2.75 per share and that Shoaf paid $8,300.00 for the shares and the other purchaser paid $8,440.00 for the same number of shares. Three thousand shares at $2.75 per share totals $8,250.00. Obviously, the totals on this document involve more simply multiplying the number of shares times the price per share. Further

confirmation of this fact is that the seller of these 6,000 shares received $16,175.00. Six thousand shares at $2.75 per share totals $16,500.00, a difference of $325.00 from the price the seller received. The same logic applies to the other trades Arst cites. The defendants' typed summary of August 19, 1992 transactions illustrates the fact that various sellers, not just Shoaf and his family, were charged different commission rates. Buyers also paid different rates. (Pltf.'s Response, App. 11.) No explanation is given

Shoaf did not purchase PCA shares because other buyers purchased the shares for sale. According to Shoaf and Thomas Sanders, who was in charge of Stifel's Over–the–Counter–Trading Department, Shoaf verbally notified Sanders in advance of Shoaf buying PCA shares for his personal or family accounts and Sanders approved each transaction.

Sometime between June 2, 1992, the date Arst and his wife entered into a contract to purchase a $365,000.00 house, and August 17, 1992, the date Arst contacted Shoaf, Arst asked his wife to contact Shoaf concerning the current selling price of PCA stock. Shoaf informed Arst's wife that $4.625 was the selling price of the most recent trade. Arst's wife agreed Shoaf simply shared factual information with her and did not encourage her to sell or to hold the PCA shares. Her deposition testimony is not clear whether Arst told her he decided to sell the shares prior to contacting Shoaf on August 17, 1992.[2] Arst said he did not decide to sell his shares until his second telephone conversation with Shoaf on August 18, 1992. Arst, however, also testified he contacted Shoaf on August 17 to sell his shares. Shoaf never contacted Arst prior to and after August 17, 1992, asking or recommending that Arst sell his PCA shares.

Arst contacted Shoaf on August 17, 1992, to discuss the plaintiff's PCA shares. As of that date, Arst had never employed Stifel as his brokerage firm or Shoaf as his broker. Arst only knew Shoaf casually through various civic and service organizations.

why different commission rates were charged. Presumably, what Shoaf means is that he paid the *same price per share* as the other purchasers.

Arst also disputes that Shoaf purchased remaining shares, contending Shoaf sometimes was the first purchaser of the shares. The plaintiff bases his contention upon the order of handwritten entries for the same date on a document listing trades of PCA shares. (Pltf.'s Response, App. 11.) Arst's contention is not persuasive in light of the fact the document sometimes lists buy transactions before sale transactions for trades occurring on the same date. Logic suggests a stockholder would have to sell shares before such shares would be available for another stockholder to buy.

**2.** The defendants rely upon the following deposition testimony of Patricia L. Arst:

During a subsequent conversation, either on August 17 or 18, Shoaf said he believed Arst could sell his shares at $4.625 per share, but Shoaf added he had never handled a transaction involving that number of shares before and could not promise all 37,500 shares would sell. Arst authorized Shoaf to sell all his shares at that price. As of August 19, 1992, Arst and his wife had not sold their current house or closed on the purchase of their new house, the purchase of which was not contingent upon the sale of their current home.

At the time Arst commissioned Shoaf to sell the plaintiff's shares, Shoaf testified he did not know if he or his family would purchase any shares. Shoaf did not discuss purchasing PCA stock with his wife until after he contacted other buyers. By August 19, 1992, Shoaf found buyers to purchase 19,900 of Arst's 37,500 shares. Shoaf and his family then decided to buy 10,110 shares, although he believed it was a risky investment. Shoaf was able to locate buyers to purchase the remaining shares. Arst earned a profit of $94,685.50 from the sale of his PCA stock.

Shoaf did not purchase any shares when another shareholder contacted him in September 1992 to sell 2,500 PCA shares. As was his practice, Shoaf contacted shareholders who had expressed an interest in buying. These shareholders purchased the shares being offered.

Prior to closing the transaction, Arst signed a nonsolicitation letter, which all buyers and sellers signed, that stated:

> Q. And you know then later that in fact Mr. Arst made some contact with Mr. Shoaf?
> A. Yes, he told me he did.
> Q. Did he tell you prior to making that contact that he was going to contact Mr. Shoaf?
> A. Yes.
> Q. Did he tell you at that point that he had made the decision that he wanted to sell that stock and he was going to contact Odis about selling it?
> A. At that point, yes.

(Pltf.'s Resp., App. 2 at 39–40.) The plaintiff suggests "at that point" does not refer clearly to a specific point in time. Additionally, Patricia Arst testified she was ill during this period of time and it affected her sequential memory.

The undersigned hereby certifies that the above transaction for the purchase/sale of these securities was not solicited directly or indirectly by Odis E. Shoaf or anyone else representing Stifel, Nicolaus, nor was the transaction solicited or procured by the means of any communications, inducements or advertisement published or sent by your company.

It is further understood by the undersigned that the only involvement of Stifel, Nicolaus is to bring the buyer and seller together and to facilitate the subsequent transfer of shares between the buyer and seller. The price for the stock has been negotiated between buyer and seller.

(Defs.' Motion, Fact Nos. 24, 47, 111, & Tab 41, Depo. Ex. 39; Pltf.'s Response, at 6–7, 13, 27.) In the letter, the plaintiff also agreed "not to hold Stifel, Nicolaus or Odis Shoaf responsible for any damages or other liability arising out of the transactions." (Defs.' Motion, Fact No. 112; Pltf.'s Response, at 27.) Arst had the opportunity to read the letter before signing it.[3] During the closing of the transaction on August 19, Arst did not express any concern about or request the identity of the purchasers. Shoaf did not disclose the identity of any of the buyers.

Prior to August 1992, Shoaf had heard rumors, which he referred to as "coffee talk," that PCA expected to make a public offering, but he had no knowledge if or when a public offering would occur. In June 1992, William Dakan, a Wichita lawyer, asked Shoaf what factors would affect the price of PCA stock. Among the factors Shoaf mentioned were rumors of a public offering, company acquisitions, and the company's earnings. Dakan understood Shoaf's comments to be speculation on what might occur in the distant future, not comments on what was certain to occur. Based upon PCA's $1,096,000.00 loss for 1991; its $387,000.00 loss for the first quarter of 1992; and PCA's purchase of a financially unstable HMO in Florida (all public information), Shoaf did not believe PCA could make a public offering in the foreseeable future. Shoaf considered such rumors insignificant and highly speculative. He also considered rumors an inappropriate basis upon which to make decisions whether to buy or sell stock, and therefore did not inform clients of such.

In 1987 or 1988, PCA began discussing the feasibility of a public stock offering with Bear, Stearns & Company, Inc. (Bear Stearns), which would serve as the investment banker. Although PCA wanted to make a public offering as quickly as possible, Bear Stearns concluded in 1988 that PCA was not ready to go public. Important to a company's capacity to make a successful public offering is the company's financial performance over a length of time. PCA continually missed financial projections and was not able to make a public offering until March 1993.

Although PCA's board of directors issued a resolution sanctioning the pursuit of a public underwriting on several occasions, including on August 1, 1992, a public offering did not take place at those times. Target dates had to be postponed because of the company's poor financial performance. For example, the April and July 1992 target dates were premised upon PCA having a profitable 1991. PCA lost more than $1 million in 1991. Bear Stearns informed PCA a public offering might be possible in September 1992 if the company satisfied certain financial performance criteria, including a profitable second quarter in 1992. The company suffered a second quarter loss, which deferred the public offering until 1993. Despite the fact PCA had a profitable third quarter and issued a press release on November 2, 1992 regarding its anticipated public offering in early 1993, such an offering still was not certain.

---

3. Arst acknowledges he was given the "opportunity" to read the letter; however, he suggests it is "doubtful" this "quick encounter ... presented a meaningful opportunity to read and understand [its] impact." (Pltf.'s Response, at 27.) As of August 1992, Arst had served as CEO of a closely held Kansas corporation for two years and had been employed in management positions for approximately 27 years. He had personal and company legal counsel available to him. Shoaf did not pressure Arst to sign the letter or tell him not to take time to read it. As a businessman, Arst understood that the terms of a document he signed bound him. He also testified that at the time he signed the letter, he intended to comply with any legal obligation the letter imposed upon him.

Shoaf testified that prior to the company's November 1992 press release, he had no knowledge of Bear Stearns' presentations to and discussions with PCA regarding a public offering. Hageman, PCA's general counsel, never shared this information with Shoaf. Hageman and Greg Peterson, PCA vice-president of finance, thought it critical to maintain the confidentiality of these discussions, and Hageman counseled PCA's officers and directors to that effect. No one at Stifel, including Shoaf, was told of PCA's discussions with Bear Stearns.

PCA stock split four for three in December 1992. PCA notified its shareholders of the proposed public offering by letter in January 1993. Also in January, on behalf of PCA, Bear Stearns made a "quiet filing" with the Securities and Exchange Commission. "A quiet filing means that no preliminary prospectuses are printed and no discussions are undertaken with various potential syndicate members. The purpose of the quiet filing is to start the review period running in case the company gets in a position to do the public offering." (Defs.' Motion, Fact No. 171; Pltf.'s Response, at 38.) The proposed February 1993 public offering was delayed because health care stocks dropped in value. PCA offered its stock for $15.25 per share on March 29, 1993.

Although there were shareholders willing to sell their shares, Arst did not attempt to purchase shares after the November press release or the January shareholder letter.

In April 1993, Arst asked the defendants to disclose the names of the purchasers of his stock. The defendants declined.

Arst then filed suit in state court against Stifel and Shoaf, who removed the case to federal court based upon a federal question. In his amended complaint filed in federal court, Arst alleges the defendants breached their fiduciary duty to him by withholding material information, i.e., the defendants knew or should have known there would be a public offering of PCA stock, and by withholding the identity of the purchasers of the plaintiff's PCA stock. Arst claims the defendants' alleged conduct violated the Securities Exchange Act, specifically, 15 U.S.C. § 78j [4] and 17 C.F.R. § 240.10b–10(a)(7)(i), and the Kansas Securities Act, specifically, K.S.A. § 17–1253 [5]. The defendants subsequently filed this motion for summary judgment.

*Summary Judgment*

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue regarding any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must resolve all disputed facts in favor of the nonmoving party. *White v. General Motors Corp., Inc.,* 908 F.2d 669, 670 (10th Cir.1990), *cert. denied,* 498 U.S. 1069, 111 S.Ct. 788, 112 L.Ed.2d 850 (1991). The existence of some disputed facts automatically does not preclude granting summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

**4.** The statute provides:
   It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
   . . . .
   (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
   15 U.S.C. § 78j.

**5.** The statute in pertinent part provides:
   (a) It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly, to:
   (1) Employ any device, scheme or artifice to defraud;
   (2) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
   (3) engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.
   K.S.A. § 17–1253.

The moving party is entitled to judgment as a matter of law if the nonmoving party fails to make a sufficient showing of an essential element of the case to which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). One of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows this purpose to be accomplished. *Id.* at 323–24, 106 S.Ct. at 2552–53. The moving party must prove entitlement to summary judgment beyond a reasonable doubt. *Norton v. Liddel,* 620 F.2d 1375, 1381 (10th Cir.1980).

### Disclosure of Buyers

■ With regard to count I of the amended complaint, the defendants argue Arst's claim based upon nondisclosure of the identity of the buyers of his stock must fail as a matter of law because 17 C.F.R. § 240.10b–10(a)(7)(i) [6] does not permit Arst an implied or private cause of action. *See Central Bank, N.A. v. First Interstate Bank, N.A.,* — U.S. —, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994); *Ohio v. Peterson, Lowry, Rall, Barber & Ross,* 651 F.2d 687 (10th Cir.), *cert. denied,* 454 U.S. 895, 102 S.Ct. 392, 70 L.Ed.2d 209 (1981); *Utah State Univ. of Agriculture & Applied Science v. Bear, Stearns & Co.,* 549 F.2d 164 (10th Cir.), *cert. denied,* 434 U.S. 890, 98 S.Ct. 264, 54 L.Ed.2d 176 (1977); *Woods v. Homes & Structures of Pittsburg, Kan., Inc.,* 489 F.Supp. 1270 (D.Kan.1980).

In *Central Bank,* the United States Supreme Court held "that a private plaintiff may not maintain an aiding and abetting suit under § 10(b)." — U.S. at —, 114 S.Ct. at 1441, 128 L.Ed.2d at 141. The court concluded § 10(b)

prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act.... The proscription does not include giving aid to a person who commits a manipulative or deceptive act. We cannot amend the statute to create liability for acts that are not themselves manipulative or deceptive within the meaning of the statute.

*Id.* at —, 114 S.Ct. at 1448, 128 L.Ed.2d at 132.

The defendants maintain 17 C.F.R. § 240.10b–10(a)(7)(i) is similar to the aiding and abetting claim because the regulation does not address conduct that is deceptive or manipulative. The defendants contend Rule 10b–10(a)(7)(i) is purely procedural, setting forth the provisions for confirming and completing a transaction. The defendants also assert that their desire to honor the confidentiality of their customers is not the type of fraudulent conduct Rule 10b–5 was intended to confront. The defendants point out Rule 10b–10(a)(7)(i) was promulgated more than 35 years after Rule 10b–5. To recognize an implied cause of action, according to the defendants, would make "relatively innocuous conduct the functional equivalent of fraud" and would upset Congress' remedial scheme set forth in the Securities Act of 1933 and the Securities Exchange Act of 1934. (Defs.' Motion, at 81.) *See Woods,* 489 F.Supp. at 1284–88 (no implied cause of action under § 17(a) because recognition of such would circumvent the restrictions and the remedies of the 1933 and 1934 Acts).

Arst correctly points out none of the authorities the defendants cite construe or apply Rule 10b–10; however, this court has found no cases addressing whether this rule permits a private cause of action. The plaintiff contends the defendants contractually obligated themselves to disclose the identity of the purchasers based upon the "Terms of

---

**6.** That regulation provides:

(a) It shall be unlawful for any broker or dealer to effect for or with the account of a customer any transaction in, or to induce the purchase or sale by such customer of, any security ... unless such broker or dealer, at or before completion of such transaction, gives or sends to such customer written notification disclosing:

 . . . .

(7) If he is acting as an agent for such customer, for some other person, or for both such customer and some other person,

(i) The name of the person from which the security was purchased, or to whom it was sold, for such customer or the fact that such information will be furnished upon written request of such customer; ...

17 C.F.R. § 240.10b–10 (1994).

Transaction" appearing on the reverse side of the confirmation slip. The plaintiff also disagrees there is any similarity between *Central Bank* and the instant case. Arst maintains a private cause of action exists if § 10b prohibits such conduct and if it is alleged the defendants .engaged in the prohibited conduct.

Both parties oversimplify the issue. In *Bormann v. Applied Vision Systems, Inc.,* 800 F.Supp. 800, 806–07 (D.Minn.1992), the court stated:

> In *Cort v. Ash,* 422 U.S. 66 [95 S.Ct. 2080, 45 L.Ed.2d 26] (1975), the Supreme Court defined the parameters under which a private right was available under a federal statute. The Court did not, however, consider the availability of a private right arising under an agency rule. This question has been considered by two circuit courts. *Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530 (9th Cir.1984) (private right of action under Rule 10b–16); *Angelastro v. Prudential–Bache Securities, Inc.,* 764 F.2d 939 (3rd Cir.), *cert. denied,* 474 U.S. 935 [106 S.Ct. 267, 88 L.Ed.2d 274] (1985) (private right of action under Rule 10b–16). *Cf. Jablon v. Dean Witter & Co.,* 614 F.2d 677 (9th Cir.1980) (private right of action under New York Stock Exchange Rule 405 and National Association of Securities Dealers Rules of Fair Practice). Both circuits have adopted a two-part test to determine the existence of an implied private cause of action under an SEC Rule: (1) whether Congress intended to delegate authority to establish a rule implying a private right of action; and (2) whether the rule was drafted such that a private action may legitimately be im-

plied. *Angelastro,* 764 F.2d at 947; *Jablon,* 614 F.2d at 679.

More recently, the Tenth Circuit Court of Appeals stated that "[a]bsent an express grant of a private cause of action, 'a mere proscription of behavior does not justify an inference of a private cause of action for its violation; instead, there must be some evidence that Congress intended one.' " *Coosewoon v. Meridian Oil Co.,* 25 F.3d 920, 929 (10th Cir.1994) (quoting *Pullman v. Chorney,* 712 F.2d 447, 449 (10th Cir.1983) (citing *Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979))).[7]

Rule 10b–10 was promulgated pursuant to the Securities Exchange Act of 1934, which was enacted because "national public interest" necessitates "regulation and control" of "transactions in securities." 15 U.S.C. § 78b. The Acts of 1933 and 1934 "constitute interrelated components of the federal regulatory scheme governing transactions in securities; the interdependence of the securities laws is a factor this court should take into account in interpreting a particular provision." *In re Olympia Brewing Co. Securities Litigation,* 674 F.Supp. 597, 612 (N.D.Ill. 1987). The two Acts "contain eight different sections that afford express rights of action for private parties." *Id.* Rule 10b–10 does not provide explicitly for a private cause of action for a violation of its terms. Further, this court is presented with no evidence Congress intended a private cause of action pursuant to Rule 10b–10. Therefore, the defendants' motion for summary judgment on count I is granted.

---

**7.** In *Jiffy Lube Int'l, Inc. v. Grease Monkey Holding Corp.,* 671 F.Supp. 1275, 1276 n. 1 (D.Colo. 1987), the court noted:

> The Supreme Court ... has steadily endorsed a more rigid stance in determining whether a private remedy is to be implied from a federal statute. In *Cort v. Ash,* the Court adopted a four-part test to measure whether a private cause of action could be implied. 422 U.S. 66, 78 [95 S.Ct. 2080, 2087–88, 45 L.Ed.2d 26] (1975). In 1979, the Court modified the *Cort* test and adopted a stricter standard. *Touche Ross & Co. v. Redington,* 442 U.S. 560, 568 [99 S.Ct. 2479, 2485, 61 L.Ed.2d

82] (1979). In *Touche Ross,* the Court stressed congressional intent over the other *Cort* factors, holding that private rights of action may be implied only if Congress intended to create such a remedy. 442 U.S. at 568 [99 S.Ct. at 2485] *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11 [100 S.Ct. 242, 62 L.Ed.2d 146] (1979), reemphasized that congressional intent is controlling on this issue. Thus, by focusing its analysis on the question of congressional intent, the Supreme Court has sharply limited the availability of implied private rights of action.

*See also Lynch v. Fulks,* No. 79–1244, 1980 WL 1484 (D.Kan.1980).

*Fiduciary Duty*

The defendants contend Arst has failed to establish elements common to the remaining claims. In count II, Arst alleges the defendants knew or had reason to know PCA intended to make a public offering and had a fiduciary duty to inform him. In count III, the plaintiff alleges the defendants had "a fiduciary duty to investigate and evaluate the possibility of PCA going public and to keep advised of the status of PCA and to advise Arst of the wisdom of selling." (Defs.' Motion, at 36.) In counts IV, V and VI, Arst alleges the defendants violated the anti-fraud provisions of K.S.A. § 17–1253 and 15 U.S.C. § 78j by failing to inform him of the anticipated public offering, and by failing to disclose the buyers' identity, specifically Shoaf and his family. Elements common to these claims are (1) a relationship between Arst and the defendants that created a duty to disclose nonpublic information, (2) the non-disclosed information was material, and (3) deception or manipulation (fraudulent intent). *See Dirks v. Securities & Exchange Comm'n,* 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983); *Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). The plaintiff does not dispute the commonality or applicability of these elements.

The defendants argue they need show only that Arst cannot prevail on any one of these elements to warrant granting their summary judgment motion on these claims. This court first will consider the fiduciary relationship arguments because " '[t]he failure to disclose material information is actionable only "when (one) is under a duty to do so." ' " *Farlow v. Peat, Marwick, Mitchell & Co.,* 956 F.2d 982, 988 (10th Cir.1992) (quoting *Windon Third Oil & Gas v. Federal Deposit Ins.,* 805 F.2d 342, 347 (1986) (quoting *Chiarella,* 445 U.S. at 228, 100 S.Ct. at 229)).

■ The defendants assert there was no relationship between the parties that created a duty to disclosure. In *Chiarella,* 445 U.S. at 235, 100 S.Ct. at 1117–18, the United States Supreme Court held "that a duty to disclose under § 10(b) does not arise from the mere possession of nonpublic market information." *See Windon Third Oil & Gas Drilling Partnership v. Federal Deposit Ins.,* 805 F.2d 342, 347 (10th Cir.1986) ("A duty arises from the relationship between the parties not merely because one party has an ability to acquire information."), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987). The Court rejected the notion that every participant in a market transaction has a general duty to disclose material, nonpublic information. *Chiarella,* 445 U.S. at 233, 100 S.Ct. at 1117; *see Hill v. Bache Halsey Stuart Shields Inc.,* 790 F.2d 817, 825 (10th Cir.1986) (Tenth Circuit "unwilling to cripple the markets in the name of absolute protection for speculators"). A duty to disclose arises from a fiduciary or other relationship based upon confidence and trust. *Dirks,* 463 U.S. at 654, 103 S.Ct. at 3261; *Chiarella,* 445 U.S. at 227–35, 100 S.Ct. at 1114–18; *see Jensen v. Kimble,* 1 F.3d 1073, 1078 (10th Cir.1993). "Without a duty to disclose, silence cannot be made fraudulent." *Windon Third Oil & Gas,* 805 F.2d at 347.

■ The existence of a fiduciary or similar relationship is determined pursuant to state law. *See Rajala v. Allied Corp.,* 919 F.2d 610, 613–14 (10th Cir.1990), *cert. denied,* 500 U.S. 905, 111 S.Ct. 1685, 114 L.Ed.2d 80 (1991). Kansas law recognizes two kinds of fiduciary relationships:

(1) those specifically created by contract such as principal and agent, attorney and client, and trustee and cestui que trust, for example, and those created by formal legal proceedings such as guardian and/or conservator and ward, and executor or administrator of an estate, among others, and (2) those implied in law due to the factual situation surrounding the involved transactions and the relationship of the parties to each other and to the questioned transactions.

*Denison State Bank v. Madeira,* 230 Kan. 684, 691, 640 P.2d 1235, 1241 (1982). The Tenth Circuit has summarized Kansas law on the fiduciary relationship implied in law based upon the facts:

Determination of whether this second type of fiduciary relationship " 'exists depends on the facts and circumstances of each individual case. [The Supreme Court of Kansas] has refused, for that reason, to

give an exact definition to fiduciary relations.'" [*Denison State Bank*, 230 Kan. at 691, 640 P.2d 1235] (quoting *Curtis v. Freden*, 224 Kan. 646, 651, 585 P.2d 993, 998 (1978)). Although such fiduciary relationships cannot be defined with precision, the Supreme Court of Kansas has prescribed "certain broad principles" which should be considered in making the determination of whether a fiduciary relationship exists in any particular factual situation:

> A fiduciary relationship imparts a position of *peculiar confidence placed by one individual in another.* A fiduciary is a person with a duty to *act primarily for the benefit of another.* A fiduciary is in a position to have and exercise, and does *have and exercise influence over another.* A fiduciary relationship implies a condition of *superiority of one of the parties over the other.* Generally, in a fiduciary relationship, the property, interest or authority of the other is *placed in the charge of the fiduciary.*

*Id.* (emphasis in original).

The court in *Denison* made clear that each of the general considerations listed above need not be present in every case in which a fiduciary relationship is alleged. However, the court emphasized that an overriding consideration in the law of fiduciary relationships was that "one may not abandon all caution and responsibility for his own protection and *unilaterally impose a fiduciary relationship on another without a conscious assumption of such duties by the one sought to be held liable as a fiduciary.*" *Denison*, 230 Kan. at 696, 640 P.2d at 1243–44 (emphasis added). The court went on to state that "[t]his is particularly true when one ... is fully competent and able to protect his own interests." *Id. Rajala*, 919 F.2d at 614.

Arst maintains a primary barrier to granting the defendants' summary judgment motion is that, under Kansas law, "the existence and extent of a fiduciary relationship is a factual issue." (Pltf.'s Response, at 53.) *See Olson v. Harshman*, 233 Kan. 1055, 668 P.2d 147 (1983); *In re Estate of Bennett*, 19 Kan. App.2d 154 syl. 3, 865 P.2d 1062 (1993). *Olson* and *Bennett* do not stand for the proposition that the existence and extent of a fiduciary obligation always must be reserved for the jury. Both courts stated "'[t]he existence or non-existence of a confidential or fiduciary relationship is an evidentiary question or finding of fact which must be determined from the facts in each case.'" *Olson*, 233 Kan. at 1057, 668 P.2d 147 (quoting *In re Estate of Relihan*, 4 Kan.App.2d 277, 279, 604 P.2d 1219 (1980)); *Bennett*, 19 Kan. App.2d 154 syl. 3, 166, 865 P.2d 1062 (quoting *Olson*, 233 Kan. at 1057, 668 P.2d 147). Here, the facts pertinent to determining the existence and extent of the alleged fiduciary relationship are not in dispute.

Arst then argues both kinds of fiduciary relationships are evident in this case. With regard to the first type of fiduciary relationship, Arst relies solely upon one PCA mailing for his claim Shoaf acted as PCA's agent or representative. That mailing stated PCA had "made arrangements for [Stifel] to accommodate the purchase/sale of the Company's stock between individual shareholders" and instructed shareholders to contact the defendants if they "desire[d] to buy or sell shares." (Def.'s Motion, Tab 32, Ex. 30.) There is no evidence the defendants agreed to act as PCA's agent. Shoaf testified he never said he was PCA's agent or representative. Arst's broker never informed the plaintiff that a broker acts as the agent or representative of the company issuing the stock when the broker buys or sells stock for his client. Neither Greg Peterson, PCA's vice-president of finance, nor Hageman considered Shoaf to be PCA's agent or representative.

■ Arst maintains the following facts support a finding of a fiduciary relationship implied by law:

> Shoaf and Stifel were represented as the persons to contact if one wanted to buy or sell PCA stock; Shoaf undertook to "get what he could" for Arst's stock; he provided information about PCA to Arst in response to a request about the stock and any market for the stock; and he chose only to provide negative information about

PCA and misinformation about the price at which trades had been effected.

(Pltf.'s Response, at 56.)

At his deposition, Arst testified that during his initial conversation with Shoaf on August 17, 1992, Shoaf told him the price per share of the last sale had been $3.75. Arst also stated that during a subsequent conversation, on either August 17 or 18, Shoaf again quoted $3.75 as the last sale price, "but thought he could get more." (Pltf.'s Response, App. 1 at 194.) According to Arst, Shoaf "came back with a price of the 4.62 or 4.62 and a fraction," but when Arst received the paperwork, the price listed was $4.25. (Pltf.'s Response, App. 1 at 194.) When questioned, Arst acknowledged that even though the stock sold at $4.625 per share, he received less than that amount because the commission was deducted from the sales proceeds. Shoaf denies ever quoting a price of $3.75 per share. It is uncontroverted no PCA stock ever sold at $3.75 per share in any transaction Shoaf handled. Nonetheless, for purposes of this motion, Arst's allegation is accepted as true.

During the course of two conversations, either on August 17 or August 17 and 18, Arst claims Shoaf:

(a) said that PCA was losing money;

(b) made a comparison between PCA's HMO in Texas and the HMO in Florida and stated that the one in Florida was unstable;

(c) said that he didn't know where the company was going;

(d) said that there [were not] many shares traded;

(e) said that the stock was "thinly traded";

(f) said that he hadn't had many trades in recent months;

(g) said that PCA could continue to lose money;

(h) said that he was concerned about the longevity or future of the company.

(Defs.' Motion, Fact Nos. 90–91; Pltf.'s Response, at 23.) Arst contends Shoaf embellished the facts, but acknowledges the information Shoaf gave him concerning PCA's financial losses was correct and was set forth in PCA mailings. PCA reported a net operating loss of over one million dollars for 1991, and in August 1992 reported an operating loss of $387,000.00 for the first quarter of 1992. Arst also admits Shoaf's other comments regarding PCA were beliefs or opinions concerning the company's future performance. *See Hill*, 790 F.2d at 824–25 (in discussion of discretionary accounts, court stated "brokers cannot be liable for honest opinions that turn out to be wrong"); *Hecox v. R.G. Dickinson & Co.*, No. 84–1789, 1987 WL 14502, *10 (D.Kan.1987) (citing *Hill*, 790 F.2d at 824–25; *Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 337 F.Supp. 107, 113 (N.D.Ala.1971), *aff'd*, 453 F.2d 417 (5th Cir.1972)) ("A broker may give investment advice to his clients incidental to the brokerage services without creating liability for those honest opinions that turn out to be wrong.").

Although Arst complains Shoaf gave him only negative information about PCA, the plaintiff does not articulate what positive comments Shoaf should have mentioned but failed to do so. Even assuming the plaintiff was misinformed about the price of the last transaction, he acknowledges Shoaf gave him the price of $4.625 or thereabouts before he agreed to the sale.

If a fiduciary relationship exists, it is based upon the agency relationship formed between Arst and the defendants. In its written acceptance of PCA's offer to act as an accommodating broker for PCA stock transactions, Stifel stated it "would charge the buyer and seller a commission while acting as their agent on an unsolicited basis." (Pltf.'s Response, App. 9.) The confirmation slip the defendants provided to Arst specified the transaction was one in which Stifel "acted as agent for both buyer and seller." (Pltf.'s Response, App. 15.)

No case law has been found discussing the rights and liabilities of an accommodating broker; therefore, case law discussing brokers in general will guide this court. The Kansas Supreme Court has concluded a broker generally acts as an agent:

"As generally defined, a broker is an agent who, for a commission or brokerage fee, bargains or carries on negotiations in

behalf of his principal as an intermediary between the latter and third persons in transacting business relative to the acquisition of contractual rights, or to the sale or purchase of any form of property, real or personal, the custody of which is not entrusted to him for the purpose of discharging his agency. Brokers have also been defined as those who are engaged for others in the negotiation of contracts relative to property, with the custody of which they have no concern. They act as negotiators in bringing other persons together to bargain; generally, they ought not to sell or contract in their own name, have no implied authority to receive payment, are not entrusted with possession of the goods bought or sold, and have no special property or lien thereon. Brokers are of many kinds, according to the particular classes of transactions in which they engage."

*Henderson v. Hassur*, 225 Kan. 678, 683, 594 P.2d 650 (1979) (quoting 12 Am.Jur.2d *Brokers* § 1, 772–73 (1964)).[8]

Arst argues summary judgment should be denied because an agency relationship has been established between the parties. There is no disagreement that Stifel agreed to act as the agent for buyers and sellers. With regard to his relationship with Shoaf, the plaintiff maintains Shoaf agreed to inform him about PCA and to acquire the best possible price for his PCA shares. The plaintiff then contends Kansas law dictates that agents owe their principals fiduciary duties. *See Simon v. National Farmers Org., Inc.*, 250 Kan. 676, 829 P.2d 884 (1992); *Merchant v. Foreman*, 182 Kan. 550, 322 P.2d 740 (1958); *George v. Bolen–Williams, Realtors*, 2 Kan.App.2d 385, 580 P.2d 1357 (1978); *Sanders v. Park Towne, Ltd.*, 2 Kan.App.2d 313, 578 P.2d 1131, *rev. denied*, 225 Kan. 845 (1978). In his brief and at the hearing, the plaintiff primarily relied upon *Merchant* and *Sanders.*

In *Merchant*, the Kansas Supreme Court reviewed the law governing agency, stating: (1) the relation of principal and agent can only be terminated by the act or agree-

ment of the parties to the agency or by operation of law, and an agency, when shown to have existed, will be presumed to have continued, in the absence of anything to show its termination, unless such a length of time has elapsed as destroys the presumption; (2) the relationship existing between a principal and agent is a fiduciary one demanding conditions of trust and confidence which require of the agent the same obligation of individual service and loyalty as is imposed upon a trustee in favor of his beneficiary and that in all transactions concerning and affecting the subject matter of his agency, it is the duty of the agent to act with the utmost good faith and loyalty for the furtherance and advancement of the interests of his principal; (3) where a fiduciary relation is established between the parties the law views with suspicion and scrutinizes very closely all dealings between them in the subject matter of the agency to see that the agent has dealt with the utmost good faith and fairness, and that he has given the principal the benefit of all his knowledge and skill, and, if it appears that the agent has been guilty of any concealment or unfairness, or if he has taken any advantage of his confidential relation, the transaction will not be allowed to stand[;] and (4) one who acts as an agent and also deals with his principal with respect to the subject matter cannot take advantage of his principal by withholding from him any information within his knowledge, including the value of the property, which might have a bearing upon the desirability of the principal to make the trade.

182 Kan. at 555–56, 322 P.2d 740 (citations omitted). The court also relied upon the following quote from 2 Restatement of The Law, Agency, § 390 comment a:

" ... Before dealing with the principal on his own account, however, an agent has a duty, not only to make no misstatements of fact, but also to disclose to the principal all material facts fully and completely. A fact is material ... if it is one which the agent

---

**8.** The 1994 American Jurisprudence Supplement adds, "Where the scope of a broker's employment is limited to bringing parties together so that they may negotiate their own contracts, he is a mere middleman or finder." 12 Am.Jur.2d *Brokers* § 1 (1994 Supp.).

should realize would be likely to affect the judgment of the principal in giving his consent to the agent to enter into the particular transaction on the specified terms. Hence, the disclosure must include not only that the agent is acting on his own account, but also all other facts which he should realize have or are likely to have a bearing upon the desirability of the transaction from the viewpoint of the principal. . . ."

*Id.* In *Sanders,* 2 Kan.App.2d at 317, 578 P.2d 1131, the Kansas Court of Appeals summarized the rules set forth in *Merchant. Simon,* 250 Kan. at 683–84, 829 P.2d 884, and *George,* 2 Kan.App.2d at 387–89, 580 P.2d 1357, offer similar pronouncements on the rules governing agency.

The defendants argue that even if there was an agency relationship between themselves and Arst, the relationship extends no further than the undertaking to which the defendants agreed. *See Hill,* 790 F.2d at 824 (agent has fiduciary duty concerning matters only within scope of agency); *see also id.* (quoting *Restatement (Second) of Trusts* § 2, comment b (1959)) (" 'A person in a fiduciary relation to another is under a duty to act for the benefit of the other *as to matters within the scope of the relation.*' "). Both principal and agent must agree to the scope of the agency relationship.

The questions that must be asked and answered are, what tasks did the defendants agree to do for Arst and did they execute those tasks appropriately? *See Hill,* 790 F.2d at 824. The defendants contend they only agreed to handle the sale of Arst's stock. If a broker's duty is merely to execute an order, the broker's duty "would be very narrow—primarily not to make unauthorized trades." *Id.* at 824; *see Limbaugh v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 732 F.2d 859, 862 (11th Cir.1984) (quoting *Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 337 F.Supp. 107, 111 (N.D.Ala.1971) ("The affair entrusted to a broker who is to buy and sell through an exchange is to execute the order, not to discuss its wisdom."), *aff'd,* 453 F.2d 417 (5th Cir.1972)). A broker acting merely as an agent for executing a trade is not required to

give advice to a customer or to evaluate the appropriateness of a trade. *Hotmar v. Lowell H. Listrom & Co., Inc.,* 808 F.2d 1384, 1387 n. 3 (10th Cir.1987); *Carras v. Burns,* 516 F.2d 251, 257 (4th Cir.1975).

The defendants argue the facts do not establish they had a duty, fiduciary or otherwise, to investigate, analyze, or evaluate the possibility of PCA making a public offering and to advise Arst in that regard. The defendants emphasize the transaction at issue was an unsolicited sale in which they agreed only to attempt to sell Arst's shares at the agreed-upon price. According to Stifel and Shoaf, their only duty was to execute the sale properly. The defendants cite the following uncontroverted facts for support: Arst had his wife contact Shoaf with regard to selling the plaintiff's shares. Arst's wife acknowledged Shoaf never encouraged her to sell or to hold the shares. Arst subsequently initiated contact with Shoaf; Shoaf did not initiate contact with Arst. Arst signed a document in which he acknowledged that neither Stifel nor Shoaf solicited or induced the sale. As a businessman, Arst understood he was bound by the terms of the document. Arst had no account with Stifel and had never used Shoaf as his broker. There was no preexisting personal, social, or business relationship between Shoaf and Arst that would give the plaintiff reason to place his confidence and trust in Shoaf. The defendants also maintain they never agreed to, or assumed, a fiduciary or similar relationship with Arst, as evidenced by the fact Stifel declined to act as a market maker for PCA stock. According to the defendants, the status of market maker carries with it the same duties Arst alleges existed here.

The defendants direct this court's attention to *Hotmar v. Lowell H. Listrom & Co., Inc.,* 808 F.2d 1384 (10th Cir.1987), a case applying Kansas law. In *Hotmar,* the plaintiffs sued their broker, claiming the broker had churned their account. The plaintiffs also raised a pendant state law claim, breach of fiduciary duty. At issue was a nondiscretionary account, which the court compared to a discretionary account. With a *discretionary* account, "the broker has formal discretionary authority to buy and sell stocks." *Id.* at

1385. With a nondiscretionary account, "the broker may still exercise control over the account" which, "though not formal, may be inferred from all the facts and circumstances." *Id.* at 1385–86 (citations omitted). Although the plaintiffs sought and received advice from the broker, it was the plaintiffs' decision whether to sell or buy. Each transaction at issue had the plaintiffs' prior approval. This court granted the broker's motion for directed verdict, finding the plaintiffs had failed to make a prima facie showing of either claim. With regard to the breach of fiduciary duty claim, this court noted that there was no evidence the broker agreed "to manage or otherwise control" the plaintiffs' account and that "merely rendering advice is not sufficient to establish a fiduciary relationship." *Id.* at 1387.

The Tenth Circuit affirmed. Regarding the breach of fiduciary duty claim, the court of appeals upheld this court's understanding and application of Kansas law. In a footnote, the Tenth Circuit further explained:

> Under Kansas law the existence of a fiduciary duty depends on the facts and circumstances in each case. *Denison State Bank v. Madeira,* 230 Kan. 684, 640 P.2d 1235 (1982). However, one may not unilaterally impose a fiduciary relationship on another without a conscious assumption of such duties by the one sought to be held liable as a fiduciary. *Id.* In this case, [the broker] never agreed to control [the plaintiffs'] account. In fact, [the broker] testified he *never* accepted discretionary accounts. Without an agreement by [the broker] to monitor the trading in [the plaintiffs'] account, no fiduciary duty was imposed on [the broker] to execute only those orders he considered "suitable" for one in [the plaintiffs'] position, and hence, no breach of fiduciary duty was shown.

*Id.* at 1387 n. 3. The court described the plaintiffs as "knowledgeable, if not … wise investor[s]." *Id.* at 1386.

The defendants argue that if there was no fiduciary relationship in *Hotmar,* there can be no fiduciary relationship under the present facts. At issue here is one unsolicited transaction, and in contrast to *Hotmar,* no ongoing account or prior transactions.

Arst attempts to distinguish *Hotmar* because the principal issue concerned whether the broker had churned the plaintiffs' account. Churning was the primary issue in *Hotmar;* nonetheless, the Tenth Circuit ruled on the fiduciary claim. What is important is the fact the court ruled upon the issue and not the length of its ruling. Arst also strives to distinguish *Hotmar* based upon the evidence presented in both cases. He acknowledges the *Hotmar* plaintiffs presented insufficient evidence to establish their claim, but maintains the evidence in this case establishes the existence of a fiduciary relationship as he frames it. This court disagrees.

As the *Hotmar* court noted, Kansas law requires the "conscious assumption" of the fiduciary duty alleged. 808 F.2d at 1387 n. 3; *see Rajala,* 919 F.2d at 615.

> Mere concert of action without more, does not establish a fiduciary relationship. Undoubtedly, parties may deal at arms's length for their mutual profit. It is only when, by their concerted action, they willingly and knowingly act for one another in a manner to impose mutual trust and confidence that a fiduciary relationship arises.

*Wolf v. Brungardt,* 215 Kan. 272, 285, 524 P.2d 726 (1974) (quoting *Paul v. Smith,* 191 Kan. 163, 170, 380 P.2d 421 (1963) (citations omitted)); *see Hecox,* 1987 WL 14502 at *10 ("Usually, a fiduciary duty for investment advice emanates from an express agreement to give advice or a course of conduct that places the broker in a position of trust and confidence as to his or her customer."). Arst has not provided evidence Stifel and Shoaf consciously assumed the duties the plaintiff alleges were violated. There is no evidence that the defendants agreed to evaluate the shrewdness of Arst selling his stock or that they agreed to investigate or evaluate the possibility PCA would have a public offering in the foreseeable future. A fiduciary obligation is not determined by whether "the principal reposed 'trust and confidence' in the agent." *Hill,* 790 F.2d at 824.

Although the courts of Kansas have suggested that a somewhat more protective approach may be used when one party is under a disability or disadvantage, *Cornett v. Roth,* 233 Kan. 936, 941, 666 P.2d 1182,

1186 (1983), *Wedman v. Home Nat. Bank of Arkansas City*, No. 88–1439–K (D.Kan., Jan. 25, 1990) (WESTLAW, 1990 WL 7501), this more protective approach will ordinarily not be utilized as between two or more business people or business entities who each possess the capacity to protect themselves. *See Ritchie Enterprises v. Honeywell Bull, Inc.*, 730 F.Supp. 1041, 1054 (D.Kan.1990) (holding that a seller's superior knowledge of a product does not justify imposition of a fiduciary relationship in the absence of a conscious assumption of fiduciary duties). The Supreme Court of Kansas has cautioned against an approach which would unfairly "convert ordinary day-to-day business transactions into fiduciary relationships where none were intended or anticipated." *Denison*, 230 Kan. at 696, 640 P.2d at 1243.

*Rajala*, 919 F.2d at 615. Arst presents no evidence he was disabled. Arst alleges, but does not establish, that the defendants had access to nonpublic information. Access to public information and rumors does not establish that the plaintiff was at a disadvantage. Arst was an experienced businessman who had made previous investments. Arst had a broker with whom he could have discussed the virtues of selling his PCA stock, but did not do so. "Under Kansas law, a fiduciary relationship is never presumed, but must be proved by clear and convincing evidence." *Flight Concepts Ltd. Partnership v. Boeing Co.*, 819 F.Supp. 1535, 1545 (D.Kan. 1993) (citing *Rajala*, 919 F.2d at 615), *aff'd*, 38 F.3d 1152 (10th Cir.1994). Furthermore, "[f]iduciary obligations should be extended reluctantly to commercial or business transactions." *Id.* (citing *Pizza Management, Inc. v. Pizza Hut, Inc.*, 737 F.Supp. 1154, 1183 (D.Kan.1990)).

Arst relies upon broad generalities of agency law to support his arguments without rebutting the finer points. Although the plaintiff may have established an agency relationship, he fails to provide facts demonstrating that the relationship and the corresponding fiduciary responsibilities are within the scope he suggests. There also is no evidence of a preexisting relationship based upon prior dealings. If there was insufficient evidence in *Rajala* to support the jury find-ing of a fiduciary duty, as the Tenth Circuit ruled, there certainly is not sufficient evidence in this case to find the defendants consciously assumed the alleged duties. *See* 919 F.2d at 616–25.

Because Arst fails to establish the defendants had a duty to disclose information, it matters not whether the alleged nondisclosure was material, nonpublic, or fraudulent. This court grants the defendants' motion for summary judgment with regard to counts II through VI.

IT IS ACCORDINGLY ORDERED this 2nd day of December, 1994, that the defendants' motion for summary judgment (Dkt. No. 38) is granted.